**UNITED STATES of America, Appellee,**

v.

**Mack BROWN, Jr., Defendant-Appellant.**

**No. 921, Docket 78–1009.**

United States Court of Appeals,
Second Circuit.

Argued May 4, 1978.

Decided Aug. 7, 1978.

Certiorari Denied Oct. 16, 1978.
See 99 S.Ct. 289.

**198**

Robert J. Jossen, Asst. U. S. Atty. S. D. N. Y., New York City (Robert B. Fiske, Jr., U. S. Atty., Henry H. Korn, Asst. U. S. Atty., New York City, of counsel), for appellee.

Leon R. Port, Brooklyn, N. Y. (Port & Port, Brooklyn, N. Y., of counsel), for defendant-appellant.

Before MOORE, OAKES and GURFEIN, Circuit Judges.

MOORE, Circuit Judge:

Mack Brown, Jr. appeals from a judgment of conviction entered on December 2, 1977, after a jury trial, of distributing approximately one-eighth kilogram of heroin on February 24, 1976 in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A). Brown also appeals from an order, entered on the same date, denying his motion for a new trial on the basis of newly discovered evidence. Brown was sentenced to eight years imprisonment and a three-year parole term and is presently serving his sentence.

On appeal Brown makes several contentions—the principal ones being a failure to disclose certain alleged *Brady* material, an improper marshalling of the evidence by the trial court, an improper use of an *Allen*-type charge to the jury, and a refusal to hold a hearing on the motion for a new trial. For reasons set forth below, we affirm.

I.

From the evidence presented, the jury could have found the following: At a February, 1976 meeting in a hospital room, Leslie Maize, a government informant, agreed to purchase one-eighth kilogram of heroin (valued at approximately $5000) from Brown and one Henry Simmons. The sale was scheduled for February 24, 1976. On that date Drug Enforcement Administration ("DEA") agent Carl Gordon drove Maize in Maize's car to the vicinity of 145th Street and 8th Avenue in Manhattan. Maize then met with Brown alone in Brown's late-model Lincoln Continental. Maize returned to Gordon and told him that Brown and Maize were going to the Bronx to pick up a heroin package and that Gordon should wait for their return. Agent Stuart Stromfeld followed Maize and Brown to the 145th Street Bridge, but lost them as they crossed into the Bronx. Approximately 1½ hours later Maize and Brown were observed re-entering Manhattan.

As a result of a conversation between Maize and agent Gordon, surveillance agents were directed to the Goldbrick Inn where the transaction was to occur. At approximately 8:45 P.M., Brown arrived at and entered the Goldbrick Inn. Maize and agent Gordon then arrived; Maize entered the bar and met Brown where they could be

seen through the window by surveillance agents. Maize then left the bar and rejoined agent Gordon, handing him a package containing approximately one-eighth kilogram of heroin. Agent Gordon gave Maize $4800 and Maize re-entered the bar. Shortly thereafter Maize returned to agent Gordon and reported that Brown had counted the money and it was short $200. Agent Gordon gave Maize the $200, then followed Maize as he went back to the bar. Agent Gordon stopped at the front window and saw Maize hand something to Brown, using the same hand with which Maize had taken the $200 from Gordon. Gordon then walked inside, and he saw Brown walk immediately to the rear of the bar. A few minutes later Brown walked by to make a phone call, and Maize then left the bar with agent Gordon.

On March 15, 1977 Brown was arrested.

## II.

About two weeks prior to the trial, Maize began to vacillate as to whether he would testify. On September 13, 1977 Maize affirmed his earlier contemporaneous statement that Brown had given him heroin on February 24, 1976, but Maize stated to the prosecutor that he would not testify. Maize gave two reasons: First, Maize was angry with DEA agents for what he claimed was their failure to fully inform the state court judge of the extent of his cooperation.[1] Second, Maize expressed concern for his safety and the safety of his family if he testified.

On September 19, 1977 Maize again told the prosecutor that he would not testify. This time he threatened to "sabotage" the case by either asserting a right not to testify, saying he "entrapped" Brown, or simply failing to remember what had happened. On September 23, 1977 Maize met with the prosecutor again and said that if called as a witness, he would state he was given the package by someone else, not Brown, in the Goldbrick Inn.

The trial began on September 26, 1977. After opening statements by counsel, the Government advised the trial court and defense counsel that Maize had indicated an unwillingness to testify. The court directed Maize's appearance and the following morning, Maize was called to the stand. Maize told the court:

"I am not taking the stand, your Honor. I don't wish to testify. As I told the defense, I gave a false statement and I don't wish to testify, and I would like to get a lawyer." Trans. 65–2.

The Government applied for an order of immunity, pursuant to 18 U.S.C. §§ 6002–03, and the order was granted. Maize refused to comply with the court's order to be sworn and was found in criminal contempt and sentenced to six months incarceration.

The Government proceeded with the remainder of its case, then the defense called Maize as a witness. Maize testified that his earlier statements to the Government naming Brown as the seller of heroin were false. He then described a new scenario as follows: Brown had acted only as a driver to "help out" Maize and the transaction was actually carried out by third parties. Maize met someone in the Bronx and obtained the heroin there. Maize then met another "party", not Brown, at the Goldbrick Inn to consummate the payment of the $5000. According to Maize, the party could not be seen from the street because the party was sitting at a table. Maize entered the bar, gave the money to the party in passing, and then went to talk to Brown. The party noticed the amount tendered was $200 short and gave a hand signal to Maize. Maize went to get the $200, returned, gave the $200 to the party as he walked in, and again went to talk to Brown. Maize indicated that he had previously lied because the Government had put pressure on him to help secure narcotics convictions.

## III.

Brown argues that the prosecutor unfairly deprived him of a fair trial by

---

1. Maize originally offered cooperation in exchange for communication of his cooperation to the state court before which were pending state burglary charges. After the 1976 transaction, Maize left the United States. In December, 1976 he was arrested for entering the United States in the possession of cocaine.

concealing until after the opening statements of counsel that Maize had recanted his original statements. Brown argues that this is a violation of the Government's obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under *Brady*, the Government may not withhold material exculpatory evidence specifically requested by the defense. "The principle has since been extended to apply to material evidence that would impeach a Government witness whose 'reliability' may well be determinative of guilt or innocence. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763 [31 L.Ed.2d 104] (1977) (knowing use by Government of perjured testimony regarding promises by the prosecutor to the witness), quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)." *Ostrer v. United States*, 577 F.2d 782 (2d Cir. 1978). However, where the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a *Brady* violation by not bringing the evidence to the attention of the defense. Where a witness is involved, "[t]he government is not required to make a witness' statement known to a defendant who is on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish". *United States v. Stewart*, 513 F.2d 957, 960 (2d Cir. 1975). *See United States v. Robinson*, 560 F.2d 507, 518 (2d Cir. 1977) (*en banc*); *Williams v. United States*, 503 F.2d 995, 998 (2d Cir. 1974) (*per curiam*). The defense was made aware of Maize's contradictory statements shortly after the opening of the trial, and was able to, and did, use Maize as a witness on Brown's behalf. Thus, the only question is: whether the defense was made aware of the vacillation in Maize's testimony early enough to take advantage of it. The defense argues that if it had been aware of Maize's vacillation earlier, the defense counsel, in his opening statement, would not have attacked Maize's credibility.

Judge Owen correctly determined that no *Brady* violation existed. Simply because the witness started to "squirm" shortly before trial did not require the Government instantly to make these vacillations of the witness known to the defense. Informers often are reluctant to testify and the Government quite reasonably could have believed that the defendant would testify under the compulsion of the district court. The Government had no obligation to disclose prior to trial that the witness had begun to "wobble" because the Government did not know whether Maize would testify, or what his testimony would be, until Maize was called to the stand. As stated by Judge Owen:

> "I can see a duty on them [the Government] to advise you that a week earlier he had repudiated that so that you could cross-examine as you wish, but before he had taken the stand and anybody knew what he was going to do I don't see that they have a duty to run across the street and say to you, 'This fellow from whom we have got a signed statement is wobbling.'
>
> So it's a question of when the *Brady* obligation falls in. At best I see it falling in, and obviously in my judgment it would fall, in at the close of his testimony, so that you would be possessed with the knowledge of this man's vacillations." Trans. 483–85.

Furthermore, Brown has made no showing of prejudice created by the belated disclosure. The defense failed to raise the *Brady* claim until after Maize had testified.[2] If the defense had feared prejudice by the belated disclosure, it could have raised its objection immediately rather than tactically deciding to use Maize's testimony and then attempting to raise the claim of a *Brady* violation.

The non-disclosure had no effect on the defense's theory of the case as described in its opening. The defense attacked Maize's potential testimony as being untruthful because the testimony was motivated by pres-

---

**2.** The defense did not even raise the question of a *Brady* violation until September 30, 1977, two days after Maize testified as a witness for the defense.

sure from the DEA and by Maize's desire for leniency in other criminal cases, in exchange for his cooperation through testimony against Brown. Defense counsel argued:

"You know, it is not so much, really, that Mr. Maize is a convicted criminal. I don't think that because you are a convicted criminal you are necessarily going to lie. What the weakness of Mr. Maize is in this particular instance is not so much that he is a convicted criminal but that he had cases pending at the time he was working with the Drug Enforcement agent.

That gave him a motive to lie. It gave him a motive. Why? Because he knew that he could derive great benefit if he made, created cases for those drug agents. Those drug agents want to make arrests and they want to make cases. That is their business and that is their career. They don't get any credits, they don't get promoted, they get no praise, if they don't make arrests.

\* \* \* \* \* \*

"In short, Mr. Maize, though he spent a great deal of time in prison, I credit that already, doesn't want to spend that much more time in, and in order to avoid it, he was out there trying to produce for these drug agents. And only Mr. Maize, strangely enough, in spite of all these agents lurking about, only Mr. Maize saw this transaction take place." Trans. 38–40.

The defense's theory was not to discredit Maize as being untruthful *per se*, but was to discredit his truthfulness through his improper motivation. Subsequently calling Maize as a witness for the defense did not interfere with this theory because the defense could have argued that Maize then was being truthful because he no longer had a motivation to lie. Thus, lack of awareness of Maize's vacillations until after defense counsel's opening statements did not prejudice the defense.

IV.

■ Appellant argues that the trial court erred when marshalling the evidence by stressing Maize's testimony in reading it word-for-word and by not stating that even if the jury discredited the testimony, the burden was still on the Government to prove the offense charged. The trial court did not abuse its discretion in marshalling the evidence here. The trial lasted several days and the court noted that in light of the "unique" circumstances of Maize's switching sides, a summary of the evidence and the contentions of each side would aid the jury in its deliberations. In the charge to the jury, Judge Owen carefully discussed the contentions of the defense which justified acquittal. Trans. 631–32. The court did read several pages of Maize's testimony, but noted that "if you find Mr. Maize is worthy of credit, then the verdict must come in as not guilty". Trans. 644. This was not a shifting of the burden of proof to the defense. Instead, it was a statement that if Maize was believed, then the jury had no choice but to acquit Brown. This interpretation is buttressed by the repeated references by the trial judge to the burden of proof resting on the prosecution.[3] In

---

3. "Mr. Brown does not have to prove anything or call any witnesses. He has the right to rely upon the failure of the prosecution to establish such proof. . . . He does not have to prove innocence. On the contrary, Mr. Brown is presumed to be innocent of the charge contained in this indictment.
　　\* \* \* \* \* \*
"The presumption of innocence is removed only if and only when you are satisfied that the government has sustained its burden of proving his guilt beyond a reasonable doubt." Trans. 615.

"Now, before you can find Mr. Brown guilty of the crime charged, you must be convinced beyond a reasonable doubt that the government has proved each of the following elements [of the crime charged] . . . ." Trans. 621.

"I have said, the burden is on the government to prove his guilt beyond a reasonable doubt as to all of the elements in the case. That burden, as I have already told you, remains upon the government throughout the entire trial and does not shift." Trans. 630.

light of these repeated references, one isolated statement in a 50 page charge to the jury cannot be read as implying to the jury that the burden of proof was shifted to the defense.

■ Brown argues that the trial court committed plain error in giving the jury an *Allen*-type charge, pursuant to *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), without the jury's request. This court has repeatedly approved the discretionary administration of an *Allen*-type charge by the district court after the jury has reached a deadlock. "The propriety of an *Allen*-type charge depends on whether it tends to coerce undecided jurors into reaching a verdict by abandoning without reason conscientiously held doubts". *United States v. Robinson, supra* at 517.

Here the jury was unable to reach a verdict after having certain of the testimony reread and after deliberating for 4½ hours. The jury sent a note indicating that they were deadlocked, but the note did not reveal the vote. The trial judge terminated deliberations for the night and gave the *Allen*-type charge to the jury members before they resumed deliberations the next morning. Brown objects to the use of the phrase "Each juror should listen with deference to the arguments of his other fellow jurors and with a distrust of his own judgment. . . ." However, this phrase was balanced by statements such as: "[Y]ou should not surrender your honest convictions as to the weight or the effect of evidence solely because of the opinion of other jurors or for the mere purpose of returning a verdict." Trans. 673–74; and "[R]emember, ladies and gentlemen, at all times, no juror is expected to yield a conscientious conviction he or she may have as to the weight or effect of evidence. If any individual juror still retains a conscientious view that is different from other jurors, he or she is not to yield his or her judgment simply because he or she may be outnum-

bered or outweighed." Trans. 676. We find nothing in the charge which exceeds the "permissible encouragement to the jurors to pursue their deliberations toward a verdict, if possible, in order to avoid the expense and delay of a new trial." *United States v. Bermudez*, 526 F.2d 89, 100 (2d Cir. 1975). The equally balanced charge referring to changing one's opinions either for conviction or acquittal and the references to maintaining individual beliefs, taken as a whole, reduced any potential for coercion to the point where we find no error in the charge under the circumstances. *See United States v. Robinson, supra* at 517.

■ After trial, Brown filed on November 21, 1977 a motion for a new trial, based on new evidence consisting of the identity of the "party" with whom Maize testified that he had conducted the transaction in the Goldbrick Inn. Brown argues that the district court erred by denying the motion without holding a hearing. In support of the motion for a new trial, an affidavit was presented from one Linda Bowman, who was not further identified by address, relationship with Maize, or the circumstances under which she came forward, which claimed that she was the "party" and had received the $5000 from Mazie in the bar on the night of the heroin sale. At oral argument on the motion, Brown's counsel conceded that Maize earlier had refused to disclose the identity of the party with whom he conducted the transaction, and Brown's counsel did not ask the court at the time of trial to compel Maize to disclose the identities of the person from whom he allegedly obtained the heroin and the person to whom he gave the heroin at the bar. App. 25–26. The burden is on the moving party to establish that the newly discovered evidence "could not with due diligence have been discovered at or before trial". *United States v. Natelli*, 553 F.2d 5, 7 (2d Cir. 1977). The defense failed to carry this bur-

"[T]he Government, to prevail, must prove the essential elements of the charge by the required degree of proof." Trans. 648.

"If the Government has failed to carry its burden, you should acquit. This is your

duty. However, if the Government has carried its burden, you must not flinch from your sworn duty but you must convict." Trans. 650.

den, and Judge Owen correctly acted within his discretion in denying a hearing on the motion.

We have examined the other contentions of the appellant and find them without merit.

Judgment affirmed.