Larry HUDSON, Petitioner-Appellant,

v.

Frank BLACKBURN, Warden, Louisiana
State Penitentiary,
Respondent-Appellee.

No. 78–1489.

United States Court of Appeals,
Fifth Circuit.

Aug. 27, 1979.

Rehearing Denied Oct. 11, 1979.

Larry Hudson, pro se.

Lawrence B. Fabacher, II (court appointed), New Orleans, La., for petitioner-appellant.

Wm. J. Guste, Jr., Atty. Gen., Baton Rouge, La., Harry F. Connick, Dist. Atty., Brian G. Meissner, Maurine Carroll, Asst. Dist. Attys., New Orleans, La., for respondent-appellee.

Before MORGAN, FAY and RUBIN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge.

Larry Hudson appeals from the denial of his petition for writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. On December 2, 1967, petitioner was convicted of murder by a Louisiana jury and sentenced to death.[1] The Supreme Court of Louisiana, in an extensive opinion, affirmed petitioner's conviction. *State v. Hudson*, 253 La. 992, 221 So.2d 484 (1969), *cert. denied*, 408 U.S. 949, 91 S.Ct. 2278, 29 L.Ed.2d 855 (1971). The Louisiana courts denied petitioner habeas relief on numerous occasions. *See, e.g., State ex rel. Hudson v. Henderson*, 262 La. 314, 263 So.2d 48 (1972); *State ex rel. Hudson v. Henderson*, 294 So.2d 545 (La.1974); *State ex rel. Hudson v. Maggio*, 337 So.2d 872 (La.1976).

After exhausting his state remedies, Hudson filed this petition in federal district court. The district court found that the state record was sufficient to dispose of petitioner's claims without an evidentiary hearing. On December 29, 1977, the court adopted the Magistrate's Report and Rec-

ommendation as its opinion and denied the petition for habeas relief.

On appeal petitioner contends (1) that a pretrial photographic display was impermissibly suggestive and created a likelihood of misidentification, (2) that the prosecutor made knowing use of perjured testimony, and (3) that he was denied effective assistance of counsel. We find petitioner's contentions to be without merit and therefore affirm the denial of habeas relief.

### I. Facts

In the predawn morning of May 15, 1967, Oscar Meeks, the manager of a New Orleans service station, received a fatal gunshot wound during a robbery attempt at his station. Frank Wilson, Meeks' assistant and the only eyewitness to the shooting,[2] testified that three men approached the station, entered the small, well-lighted office where the two attendants were working, and inquired the price to fix a flat tire. When Meeks replied, the leader of the group, later identified as Hudson, produced a pistol and demanded money. Meeks resisted and, in the ensuing scuffle, was pushed out the station door and shot. At this point Wilson escaped the robbers by fleeing through a side door. He ran a block and a half and immediately returned to the station. When he arrived, two of the robbers had fled and the third was being held at gunpoint by the wounded Meeks.

### II. The Photographic Display

On November 29, 1967, the day before trial, the district attorney conducted a photographic spread before Frank Wilson. The district attorney displayed two photographs to the witness, one of Larry Hudson and the other of a co-defendant who was tried with petitioner. The witness testified at trial that he was not told the identity of the persons in the photographs or their significance to the case. When asked if he recog-

---

1. Petitioner's death sentence was later commuted to life imprisonment.

2. Another witness testified that he was walking in the vicinity and heard the gunshots. However, he did not get a clear view of the two men who fled from the scene.

nized the men in the photographs the witness replied that he did. On November 30, 1967, the witness made an in-court identification of Hudson. The petitioner contends that the identification procedure was unnecessarily suggestive and conducive to irreparable mistaken identification.

The due process standard for reviewing photographic identification procedures was stated by the Supreme Court in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). This Circuit has applied that standard as a two-prong test. *United States v. Smith*, 546 F.2d 1275 (5th Cir. 1977); *Bloodworth v. Hopper*, 539 F.2d 1382 (5th Cir. 1976); *United States v. Gidley*, 527 F.2d 1345 (5th Cir.), *cert. denied*, 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976). The court must first decide whether the photographic display was impermissibly suggestive. If the court concludes the display was suggestive, it must then determine whether the procedure created a substantial risk of misidentification. Under this analysis, "reliability is the linchpin in determining the admissibility of identification testimony . . . ." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Thus, an identification found to be reliable will be admitted even though the confrontation procedure was suggestive.

We conclude that the photographic identification procedure employed in this case was impermissibly suggestive. As this court has recognized, a single photograph display is one of the most suggestive methods of identification and is always to be viewed with suspicion. *Bloodworth v. Hopper*, 539 F.2d 1382 (5th Cir. 1976); see *Manson v. Brathwaite, supra*, 432 U.S. at 116, 97 S.Ct. 2243; *Simmons v. United States, su-*

*pra*, 390 U.S. at 383, 88 S.Ct. 967. Despite the impermissible suggestiveness of the procedure, however, we believe that, under the "totality of the circumstances" present in this case, there was no substantial likelihood of misidentification. Therefore the identification evidence was properly allowed to go to the jury.

The factors to be considered in evaluating the reliability of the identification were enumerated in *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) and reaffirmed in *Manson v. Brathwaite, supra*, 432 U.S. at 114, 97 S.Ct. 2243. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. In this case the witness was in close proximity to all three robbers and had an unobstructed view of the gunman as he exchanged words with Meeks. There were no customers at the station during this early morning hour, and, therefore, the three men had Wilson's undivided attention. Moreover, Wilson's attention was naturally focused on the gunman since he was the leader of the trio and the one who spoke to Meeks. At trial[3] Wilson clearly described the clothing worn by the gunman and was quite positive about both his photographic and in-court identification of the petitioner.[4] Wilson also identified the other members of the trio[5] during Hudson's trial and was able to describe each man's role in the crime with a great deal of particularity. Although the fact that the photographic display and the in-court identification occurred some six months after the fatal shooting would be

---

3. The record does not reveal the nature of the description Wilson gave to the police immediately after the crime occurred.

4. Wilson was also certain about his identification of Hudson at the lineup. He was able to describe the clothing worn by Hudson on that occasion, and he remembered Hudson's position in relation to the other participants in the lineup.

5. Wilson made an in-court identification of Hudson's co-defendant, John Duplessis. During the course of the trial the defense brought Hayes Williams, a co-defendant who pled guilty to this crime, into the courtroom. Wilson identified Williams as one of the participants in the crime.

considered a "seriously negative factor" in most cases, *Neil v. Biggers, supra,* 409 U.S. at 201, 93 S.Ct. 375, the strength of the other indicia of reliability persuades the court that no mistake was made in this case.

### III. Prosecutorial Misconduct

▮ During the trial the state's key witness, Frank Wilson, testified that he identified Hudson at a pretrial lineup held five days after the crime. The defense called Officer Clement DeSala who testified he was present at the lineup and that Wilson did not make an identification at that time. From these facts the petitioner concludes that the prosecution made knowing use of perjured testimony at trial. There is no basis in the record for this conclusion. Frank Wilson's testimony that he had identified Hudson in a police lineup was elicited on cross-examination by defense counsel. The prosecution never attempted to introduce, nor even mentioned, Wilson's testimony regarding the lineup.

▮ Petitioner also asserts that the prosecution's failure to disclose impeachment evidence affecting a key witness' credibility requires the granting of a new trial. It is clear that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility" violates fundamental principles of due process. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), *quoting Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The conflict in testimony regarding the lineup has a direct bearing on Wilson's credibility and was, therefore, material evidence.[6] Thus, we believe that the prosecution was under an affirmative duty to disclose the contro-

versy surrounding the pretrial identification. However, we cannot agree with petitioner that this breach of duty requires reversal in this case.

▮ In *Giglio* the impeachment evidence was never presented to the jury for its consideration. In this case, on the other hand, the jury heard the testimony of both the witness and Officer DeSala and, therefore, was fully aware of the controversy surrounding the lineup. There is no evidence that the petitioner's case was prejudiced by the prosecution's failure to introduce the officer's testimony, and the petitioner has not alleged that he was disadvantaged by the government's failure to disclose the information before trial. Because the jury was made aware of the information, we believe any error committed by the prosecution was harmless. *Gorham v. Wainwright,* 588 F.2d 178 (5th Cir. 1979); *United States v. Jones,* 580 F.2d 785 (5th Cir. 1978); *United States v. Colyer,* 571 F.2d 941 (5th Cir.), *cert. denied,* 439 U.S. 933, 99 S.Ct. 325, 58 L.Ed.2d 328 (1978). *See also United States v. Brown,* 582 F.2d 197 (2d Cir.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978).

### IV. Effective Assistance of Counsel

In a final argument petitioner contends that he was denied effective assistance of counsel. In making this argument petitioner does not claim that his trial counsel was incompetent. Instead, he alleges that his counsel's efforts to represent him were so impeded by the trial court that he was deprived of reasonably effective assistance. The first example of interference allegedly occurred when the trial judge refused to grant defense counsel's request for a recess. According to petitioner, defense counsel was exhausted at the time the request was

---

**6.** At one point the district court concluded that these facts do not meet "the *Giglio* requirement that the false testimony must be a highly significant factor reasonably likely to have affected the judgment of the jury." *Griffith v. United States,* 535 F.2d 320, 321 (5th Cir. 1976). We believe that evidence pertaining to a key witness' credibility clearly meets the *Giglio* materiality requirement.

We also note that the district court determined that Wilson was not lying when he testified that he had identified Hudson at the lineup. Although we conclude that this finding is not clearly erroneous, we believe that, under *Giglio,* the prosecution was obligated to disclose the information.

made and, as a direct result of the denial, neglected to introduce into evidence a photograph of petitioner that the state's witness had failed to identify.

■■■■ A motion for a recess is addressed to the sound discretion of the trial court and, absent abuse, the court's decision will not be overturned on appeal. In this case the court had recessed for dinner at 5:30 p. m. and resumed the proceedings at 8:00 p. m. The trial proceeded until the state rested its case at 10:20 p. m. At this point defense counsel asked for a recess until the following morning. The judge denied counsel's request and, instead, ordered a five minute recess. Following this short intermission, the trial proceeded for approximately thirty minutes, when the defense rested. Under these circumstances we cannot say that the trial court abused its discretion in refusing to grant the requested recess. The trial judge was intimately acquainted with the facts, the issues, and the arguments that counsel would likely advance at trial. He no doubt foresaw that the trial was near an end and, rather than pause at this point, preferred to see the task through to completion. We believe that, in this case, the trial court was the best judge of counsel's and the jury's stamina, and we hold that defendant's counsel was not rendered ineffective by the court's refusal to grant a recess.

■■■ The second instance of ineffective assistance of counsel allegedly occurred when the trial judge refused to grant a directed verdict as he had promised. Prior to trial, Hudson's defense counsel made a motion for Bill of Particulars in which he requested information regarding a police lineup.[7] At the hearing on this motion the trial judge denied access to the requested information but told Hudson's counsel the following:

. . . I tell you what your remedy is under the circumstances, understand? In other words, if on the trial of the case

any witness testifies they identified this defendant in the Courtroom, and that person has viewed them in a showup, lineup, and you bring that out, you can then ask me to give you a directed verdict if that's the only evidence they have, and I will do so. That's what [*United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)] states.

Petitioner alleges that trial counsel was misled by the court's promise of a directed verdict in that he abandoned defenses that otherwise would have been asserted at trial.

Prior to oral argument this court asked counsel for additional information regarding the nature of defense counsel's reliance on the trial judge's promise. Specifically, we asked what defense counsel would have done differently had the judge not made the statement quoted above. In response to this question, petitioner's counsel informed the court that trial counsel, relying on the judge's promise, did not seek to discover any information concerning the lineup. According to counsel, "had the judge simply denied the Bill of Particulars [trial counsel] would have done what was necessary to refute the fact that Wilson identified Larry Hudson at the lineup."

The record discloses that the trial judge denied defendant's request for information about the lineup at the hearing on the Motion for Bill of Particulars held on October 6, 1967. Thereafter, on October 20, 1967, a hearing was held on defendant's Motion to Suppress. During the course of that hearing defense counsel had an opportunity to question Officer DeSala about the circumstances of the lineup. Defense counsel heard Officer DeSala testify that a lineup was held, that four other men were in the lineup, and that no identification was made of the defendant. It thus appears that counsel was able to obtain most of the information that had been denied him in

---

7. In the Bill of Particulars the defendant asked that he be furnished with the following information: "was the defendant placed in a police line-up?"; if so, "who was brought in for the purpose of identifying him?"; "how many persons were put in the line-up?"; and "was any identification of Larry Hudson made by anyone at the line-up?".

the Bill of Particulars.[8] Equipped with this information counsel was able to bring to the jury's attention that there was a controversy surrounding Frank Wilson's testimony that he identified Hudson at the lineup. In view of these facts, we do not believe that the defendant suffered as a result of the judge's statement.

Additionally, we note that the trial judge's promise of a directed verdict was made in the context of a discussion of the Supreme Court's opinion in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). This case began shortly after the *Wade* Court ruled that a post-indictment lineup is a critical stage of criminal proceedings entitling the accused to the presence of counsel. The trial judge was troubled by evidence that suggested defense counsel was not present at the lineup. The court's statement grew out of this concern and was based on the judge's mistaken assumption that, under *Wade*, counsel's absence from Hudson's lineup would require a directed verdict. The promise was based on an error of law[9] which, absent prejudice to the defendant, the judge was not obliged to adhere to. Furthermore, the record reveals that defense counsel never tried to take advantage of this promise or even mentioned the promise again. We do not believe that defendant's case was prejudiced by the court's statement regarding a directed verdict.

The judgment of the district court is AFFIRMED.

---

8. *See* note 7 *supra.*

9. Since the lineup confrontation occurred in May 1967, the rule announced in *Wade* is inapplicable in this case. *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (the exclusionary rule applicable to identification confrontations conducted in the absence of counsel is not retroactive but applies only to confrontations arising after June 12, 1967).