[No. 7706–6–I.   Division One.   October 13, 1980.]

THE STATE OF WASHINGTON, *Appellant,* v. CLARENCE E. WILLIAMS, *Respondent.*

*Allen & Hansen* and *David Allen,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Philip Y. Killien* and *Charlene Iboshi, Deputies,* for respondent.

SWANSON, J.—A jury found Clarence E. Williams guilty of robbery in the first degree, kidnaping in the first degree, and murder in the first degree. The trial judge set aside the verdicts and granted Williams a new trial from which the State appeals.

The identity of the culprit was the primary issue at trial, and concern over possible misidentification was the underlying basis for ordering a new trial.[1] Whether the trial court abused its discretion in overturning the jury verdict is the primary issue on appeal.

---

[1]The conscientious trial judge was troubled by the possibility that the jury had convicted an innocent man. Several days after the trial's conclusion, the trial court wrote the following letter to the parties. The State contends this letter is an indication of the court's disagreement with the jury verdict.

February 6, 1979

Mr. Norman Maleng
Prosecuting Attorney
W554 King County Court House
Seattle, Washington 98104
Phillip Killien
Deputy Prosecuting Attorney
Charlene Iboshi
Deputy Prosecuting Attorney
David Allen, Attorney for Clarence E. Williams
2900 Smith Tower
Seattle, Washington 98104

Re: State v. Williams

CONFIDENTIAL

Before I proceed further with this case, I wish to request that in the light of the persuasive testimony introduced by the defense in support of their theory of mistaken identity, that every effort be undertaken to determine the identity of the individual identified as one of the persons in the 19th Hole Tavern as being the same person photographed at the Seven–Eleven Store during the robbery. I am ordering transcribed for your use and assistance the testimony of the several witnesses involved.

I believe if this request is generally disseminated, in view of the notoriety this case has already attracted, it may result in the individual absconding unless that has already occurred inasmuch as the best follow–up opportunity was at an earlier time. Nevertheless, I believe we we [sic] all have a serious obligation to the administration of justice to assure that every effort is made to pursue the records of the Veterans Hospital and all other information which has now come to light. I believe further proceedings should abide that serious effort.

With the issue of identification being so critical in this case, I also intend to reconsider all of the circumstances of the line–up and request counsel to brief

At about 3:50 a.m. on September 25, 1978, Alan Johnson and Bradley Farris drove to a 7–11 store at 4886 Beacon Avenue South in Seattle to buy some cigarettes. Farris started to enter the store to make the purchase but was stopped at the door by a man inside who said, "We're closed. I can't sell you anything." Farris persisted and, after a brief discussion, the man agreed to sell Farris two packs of cigarettes for $2. Farris and Johnson, who had watched the incident from the car, agreed that the man's conduct was suspicious. They drove to a telephone booth half a block from the store and called the police, reporting a suspected robbery. Shortly before 4 a.m., officers responded to the call but found the store dark, the doors locked, and nobody in the vicinity. At about 6:15 a.m., the owner of the store arrived to relieve Laura Anne Baylis, the night clerk. The owner found the store locked and Baylis missing. Entering the store, the owner found the cash register open and empty of money. A $2 bill that tripped a hidden camera in the store when removed from the register was also missing. The owner's efforts to locate Baylis were unsuccessful.

Processing of film in the hidden camera revealed a series of photographs showing Laura Baylis and a black man. The man stood behind a counter with his back to the camera as Baylis apparently emptied money from the cash register into a paper bag. In most of the photographs, the man faced directly away from the camera. In two of the pictures, he faced to his left so that his left profile was revealed. The man was dressed in a khaki "fatigue" jacket and a blue cap and wore glasses.

Some 200 copies of one of the profile photographs were prepared. The photograph was published in newspapers,

thoroughly all identification issues for post–trial motions in light of all of the testimony which was adduced at trial.

Very truly yours,
Nancy Ann Holman

NAH:ar
cc: Clarence E. Williams

displayed on television, and shown by police investigating the case. Alan Johnson and Bradley Farris were shown the picture the day after the robbery and identified the man in the picture as the man they had seen inside the store. Police also interviewed Curtis Woo, who told them that he had entered the 7–11 store between 3:30 and 4 a.m. on September 25. He saw no clerk in the store and noticed the cash register drawer was open and empty. A man then came from a back room of the store and told Woo the store was closed. Woo told police that the man in the photograph was not the man he had seen in the store. Patrons of the 19th Hole Tavern near the 7–11 store were also shown the picture. Three of them identified the man in the photograph as having come into the tavern with another man between the hours of 10 p.m. and midnight on September 24. One of the tavern customers said the men acted very suspiciously.

Distribution of the photograph produced many calls to the police reporting sightings of men resembling the man in the photograph. On October 7, police received a call from Larry Wilkins, one of the 19th Hole Tavern customers previously interviewed. Wilkins said that he had seen the man from the tavern again the previous evening leaving the Veterans Administration Hospital. The hospital is located in the vicinity of the tavern and the 7–11 store. Police showed the robbery photograph to Richard Crookes, a security officer at the hospital. According to a police report, Crookes said he had not seen the man in the photograph but that several hospital employees, including a pharmacist, had seen the man on the day Wilkins reported seeing him at the hospital.

On October 14, 1978, the body of Laura Baylis was found in the basement of an abandoned house at 6309 Beacon Avenue South. She had been stabbed numerous times. The doctor who examined the body testified that Baylis had been dead for approximately 3 to 4 weeks before her body was found.

On October 16, an anonymous caller to the police identified the man in the robbery photograph as possibly being

Clarence E. Williams. On October 19, police interviewed Williams at the Seattle shipyard where he worked and arrested him the next day. Williams lived at 6131 Beacon Avenue South, several doors away from the abandoned house where Baylis' body was found. He told police that three or four times in the preceding 6 months he had been inside the abandoned house. He admitted resembling the man in the photograph and said his wife thought he was the same man. He denied involvement in the crimes. Officers searching Williams' home and locker at work found clothing similar to that worn by the man in the photograph, numerous knives, and about 10 pairs of safety eyeglasses.

On October 23, police conducted a lineup of five men including Clarence Williams. Witnesses at the lineup were Alan Johnson, Bradley Farris, Curtis Woo, Larry Wilkins, and the other two 19th Hole Tavern customers. Johnson selected Williams from the lineup as the man he had seen inside the 7–11 store. Farris picked another man. Woo stated the man he had seen in the store was not in the lineup. Wilkins said the man he had seen in the tavern was not in the lineup but that he recognized Williams as a participant in a neighborhood softball program that Wilkins supervised. The two other tavern witnesses identified Williams as the man they had seen in the tavern. Williams was subsequently charged with the robbery of the 7–11 store and the murder and kidnaping of Laura Anne Baylis.

At Williams' trial, Johnson and Farris identified him as the man they had seen in the store. Woo, Wilkins, and one of the other tavern witnesses testified Williams was not the man they had seen. The third tavern witness did not testify.

Williams' trial, excluding jury deliberations, lasted 12 days. Johnson and Farris testified on the first day of the trial. Five days later the prosecution revealed to the court that it had learned the previous afternoon that an irregularity had occurred during Williams' lineup. A police sergeant had shown lineup witnesses a copy of the robbery in progress photograph minutes before they were to view the

lineup. A hearing followed outside the jury's presence. A tape recording of the sergeant's instructions to the witnesses was played to the court. The instructions included the statement, "I'm sure all of you have seen this photograph before? Have you not?" The sergeant testified that at this point he had removed a 3- by 5-inch copy of the photograph and held it in front of the witnesses who were assembled approximately 50 inches away from him. The sergeant testified that he showed the picture to the witnesses because, "I wanted them to remember that they had seen the photograph . . ." He stated that all the witnesses nodded that they had seen it. Timing of the tape suggests that the sergeant displayed the photograph for no longer than approximately 10 seconds.

Williams then moved, on the basis of the lineup irregularity, to suppress the identifications of Johnson and Farris and to dismiss under CrR 8.3(b).[2] The court denied both motions.[3] The prosecution proposed several remedies to

---

[2]CrR 8.3(b) provides:

"The court on its own motion in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution and shall set forth its reasons in a written order."

[3]The trial judge explained her denial of the motion to suppress by stating:

"If the photograph that had been displayed would have been a mug shot or a photograph of an individual in the line-up, I would agree with you, Mr. Allen. But I'm going to deny the motion, because in this showing today, at least as to Mr. Johnson, the identification appears to be based upon his independent observation of the style, the manner and the appearance of the individual who was in the line-up, that he selected.

"I think this is regrettable in the sense that it has injected some problems into this circumstance, but I'm satisfied that, number one, the exposure of the photograph was not of the defendant or anyone in the line-up, such as a mug shot; that it was displayed at a distance and for a period that was very minimal. And again, it was something that had been observed by these people through dissemination of the media. Whether that makes it worse or not is again a very difficult problem of psychological measure.

"In any event, it was the unusual ability to have in this instance a photograph record of the robbery in progress, which I think distinguishes this from those cases in which the Court is considering a circumstance in which the identifiers are literally being led to a particular individual who is in the line-up. So, I'm denying the motion to suppress."

cure any prejudice to the defendant caused by the belated revelation of the lineup procedure. These included calling the sergeant to testify before the jury, granting the defense a continuance, and recalling Johnson to the stand. The defense objected to recalling Johnson, stating that to do so would simply reemphasize his identification of Williams.[4] The court decided then to allow the State to call the sergeant and another police officer. The sergeant testified before the jury that he had shown the photograph to the lineup witnesses. The tape of the sergeant's instructions to the witnesses was played to the jury. Defense counsel cross-examined the sergeant, eliciting testimony that showing lineup witnesses a photograph was an unusual practice and that the sergeant had not done it before. The State then called a detective to explain that police reports did not include mention of the sergeant's showing of the photograph to the lineup witnesses.

The trial then proceeded without incident to its conclusion. Jury deliberations lasted 5 days. On the third day of deliberations, a juror became ill and had to be excused. The defendant did not seek a mistrial but elected to proceed with 11 jurors. The jury returned a "guilty" verdict on each of the three charges.

The defendant moved for a new trial on two principal grounds: the lineup procedures and alleged newly discovered evidence concerning the testimony of Richard Crookes, the security officer at the Veterans Administration Hospital. Crookes testified at the hearing on the motion for a new trial that he believed he saw a man resembling the man in

---

[4]Defense Counsel: "Your Honor, I would object to the recall of Mr. Johnson. I think the recall of Mr. Johnson at this point would just have the effect of reemphasizing his identification. And the State is saying they'll do this to try to clear up any problem. In fact, this is really going to accrue to them. They're going to call Mr. Johnson. He's going to say, 'Well, I don't even recall seeing the thing. I'm not sure if I saw it. And besides, I'm sure that's the guy, because I remember.'

"That's really going to be very prejudicial to us. Certainly they have the right to recall Mr. Johnson back on rebuttal if there's something to rebut. But they can't recall an eyewitness to an incident to testify twice during their case in chief.

"I would object to that."

the robbery in progress photograph standing in a line at the hospital pharmacy on October 6, 1978. He said he believed he gave the police this information. He also testified that he could not tell whether that person was Clarence Williams. Williams' counsel argued that Crookes' testimony constituted newly discovered evidence because the police report had indicated that Crookes had not seen the man in the photograph at the hospital. Defense counsel argued that Crookes' testimony was important because "it would corroborate the testimony of Larry Wilkins," who had reported seeing the man in the photograph at the hospital. The defense contended that it had been unable to interview Crookes prior to the trial because he had been attending a training school in another state. Crookes confirmed at the hearing that he had been at the training school.

The trial court granted the motion for a new trial. The court entered the following findings of fact and conclusions of law:

### FINDINGS OF FACT
#### I.I

Richard Crooks [sic], who is a security officer at the Veterans' Administration Hospital, was not available to testify at trial in this case because he was in West Virginia at a training session at the time of the trial;

#### I.II

The defendant could not have located Richard Crooks [sic] prior to trial in the exercise of reasonable diligence because the Seattle Police Department erroneously, though not intentionally neglected to indicate on their follow–up reports that Richard Crooks [sic] told them that he witnessed a Black man fitting the general description of the suspect in the Veterans' Administration Hospital on or about October 6, 1978, which was significant in that it corroborated the testimony of a crucial defense witness;

#### I.III

The testimony of Richard Crooks [sic] is material to the defendant's case and would probably have changed the jury's verdict;

## I.IV

During the trial, for the first time, the Court and the defense learned that the Seattle Police Department showed a picture of the suspects to witnesses just prior to the lineup;

## I.V

The two crucial State's witnesses, Mr. Johnson and Mr. Farris, had already testified at the time that the Court and the defense learned of the above–mentioned procedure;

## I.VI

The defense was not able to use this information in order to effectively cross–examine and impeach the witnesses and therefore the defendant's right to a fair trial may have been substantially affected.

Having entered the foregoing Findings of Fact, this Court does hereby enter:

### CONCLUSIONS OF LAW

## II.I

Richard Crooks' [*sic*] testimony is newly discovered evidence material to the defendant which the defendant could not have discovered with reasonable diligence and produced at trial and which would have affected the jury's verdict;

## II.II

The procedure mentioned previously regarding the lineup procedure constituted an irregularity in the proceedings of the Court as well as accident and surprise which the defendant could not counter at that time and which also mandates a new trial;

## II.III

The verdict in this case is contrary to law and the evidence and substantial justice has not been done and a new trial is required to insure that the defendant is given a fair trial.

■ A trial court is invested with broad discretion in granting a motion for a new trial, and the trial court's determination will not be reversed on appeal absent an abuse of discretion. *State v. Marks,* 71 Wn.2d 295, 427 P.2d 1008 (1967). A much stronger showing of an abuse of discretion will ordinarily be required to set aside an order granting a new trial than one denying a new trial. *Detrick*

*v. Garretson Packing Co.*, 73 Wn.2d 804, 440 P.2d 834 (1968). An abuse of discretion is "discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

CrR 7.6(a) specifies the grounds upon which a court may grant a motion for a new trial.[5] The court's conclusions of law show that its basis for granting a new trial was on these five grounds: (1) The testimony of Officer Crookes constituted newly discovered evidence. CrR 7.6(a)(3); (2) The display of the robbery in progress photograph before the lineup constituted an irregularity in the proceedings which prevented the defendant from having a fair trial. CrR 7.6(a)(5); (3) The display of the photograph constituted an accident or surprise. CrR 7.6(a)(4); (4) The verdict was contrary to law and the evidence. CrR 7.6(a)(7); and (5) Substantial justice had not been done. CrR 7.6(a)(8).

Examination of case law and the record in this case shows that the court abused its discretion in granting a new trial in that each of the grounds it gave in support of a new trial is untenable. *See State ex rel. Carroll v. Junker, supra.*

---

[5] "The court on motion of defendant may grant a new trial for any one of the following causes when it affirmatively appears that a substantial right of the defendant was materially affected:

"(1) Receipt by the jury of any evidence, paper, document or book not allowed by the court;

"(2) Misconduct of the prosecution or jury;

"(3) Newly discovered evidence material for the defendant, which he could not have discovered with reasonable diligence and produced at the trial;

"(4) Accident or surprise;

"(5) Irregularity in the proceedings of the court, jury or prosecution, or any order of court, or abuse of discretion, by which the defendant was prevented from having a fair trial;

"(6) Error of law occurring at the trial and excepted to at the time by the defendant;

"(7) That the verdict or decision is contrary to law and the evidence;

"(8) That substantial justice has not been done. When the motion is based on matters outside the record, the facts shall be shown by affidavit."

■■ A new trial on the ground of newly discovered evidence will not be granted unless the evidence (1) will probably change the result, (2) was discovered since the trial, (3) could not have been discovered before the trial by the exercise of due diligence, (4) is material, and (5) is not merely cumulative or impeaching. *State v. Franks*, 74 Wn.2d 413, 445 P.2d 200 (1968); *State v. Edwards*, 23 Wn. App. 893, 600 P.2d 566 (1979).

The trial court erred in granting a new trial on this basis because the alleged newly discovered evidence concerning Richard Crookes was merely cumulative. In its finding of fact No. I.II, *supra,* the court stated that Crookes' proffered testimony "was significant in that it corroborated the testimony of a crucial defense witness". "Cumulative evidence is additional evidence of the same kind to the same point." *Roe v. Snyder*, 100 Wash. 311, 314, 170 P. 1027 (1918). Crookes' proffered testimony was cumulative because it was merely additional evidence that a man resembling the man in the robbery in progress photograph had been seen at the Veterans Administration Hospital. Larry Wilkins' testimony was already evidence of the same kind on this point, as was the testimony of a hospital pharmacist. Because the significance of Crookes' testimony was solely its corroboration of these witnesses, we must conclude that the granting of a new trial on the basis of newly discovered evidence was an abuse of discretion.

Williams also argues that Crookes' proffered testimony compels a new trial under *United States v. Agurs,* 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976). *Agurs* held that a defendant is denied due process when, following a general discovery request or no request at all, the prosecution fails to disclose evidence sufficiently material to raise a reasonable doubt as to guilt. In such a situation, *Agurs* requires the verdict to be set aside and a new trial to be granted. Williams argues that *Agurs* applies because, following his discovery request for any exculpatory information or evidence, the prosecution failed to reveal that Officer Crookes

told police that he had seen a man matching the description of the man in the robbery photograph.

■ *Agurs* does not support granting a new trial here. Actions of the police in failing to disclose evidence may be attributable to the prosecution. *See Seattle v. Fettig,* 10 Wn. App. 773, 519 P.2d 1002 (1974). Here, however, the record does not support the trial court's finding that the police department "erroneously, though not intentionally neglected to indicate on their follow–up reports that Richard Crooks [*sic*] told them that he witnessed a Black man fitting the general description of the suspect. . . ." Crookes testified at the hearing on the motion for a new trial as follows:

Q. Now, directing your attention to October 6, 1978, do you recall on that day whether you saw anything . . . unusual in the pharmacy area of the hospital, at least that subsequently became significant?

A. I noticed a black male in the pharmacy line sometime between 4:00 and 6:00 o'clock, wearing a field jacket and a distinctive hat.

. . .

Q. And, regarding seeing that person in the pharmacy line, can you tell whether that person is the same person sitting here at counsel table with me, Clarence Williams?

A. No, I can't tell.

Q. Why is that?

A. Well, there was no reason to suspect anything. It just caught my eye, a man in the pharmacy line, because of the hat and the field jacket.

Q. . . . Now, on October 9 when you talked to Detective Stewart, did you tell Detective Stewart that you observed that man in the pharmacy line?

A. *I'm not sure, but I believe I did.*

Q. Could you have told somebody at a later time, if not on October 9?

A. Possibly, yes.

Q. And what makes you think that you told the police that you saw this person in the pharmacy line?

A. Because it's pertinent to the case. The man fit the description, and I thought they should know about it. . . .

Q. Officer, I'm showing you a picture, and I think the prosecutor agrees that this was the main picture used during the trial. This is of the ongoing robbery. Did the person you saw in the line at the pharmacy resemble this picture?

A. *I believe so, yes.*

(Italics ours.) Crookes' mere *belief* of what he told the police, categorically disputed later at the hearing by Detective Stewart, is not substantial evidence to support the court's unequivocal finding that the police failed to report that Crookes told them he had seen a man resembling the man in the photograph. Furthermore, even if Crookes' belief is accurate, his proffered testimony was merely cumulative to that of other witnesses and of such negligible impact that it would not have created a reasonable doubt as to Williams' guilt. The *Agurs* test is not met.

The trial court also abused its discretion in ordering a new trial on the ground that the belated revelation of the display of a photograph at the lineup deprived Williams of a fair trial. We emphasize that we do not condone the showing of photographs to witnesses immediately before they are to view a lineup. Such a practice can cause misidentifications, because witnesses may tend to base their identifications on the photographs shown rather than on their memories of the crime they witnessed.[6] In–court eyewitness identification is suppressible when pretrial identification procedures are so impermissibly suggestive as to give rise to a "very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968). The trial court, although ruling that the in–court identifications of witnesses Johnson and Farris were not suppressible under this test, nevertheless held that a new trial was warranted because the disclosure of the lineup irregularity came too

---

[6]E. Loftus, *Eyewitness Testimony* 150–51 (1979); N. Sobel, *Eye–Witness Identification* § 45.01 (1972); Note, *Pretrial Identification Procedures—Wade to Gilbert to Stovall: Lower Courts Bobble the Ball,* 55 Minn. L. Rev. 779, 798–99 (1971).

late in the trial to allow for effective cross–examination of these witnesses on the issue of suggestibility. Examination of the record, however, shows that any harm to Williams created by this late disclosure was so minimal that it did not deprive him of a fair trial.

The possibility is slight that the display of the photograph led to misidentification of Williams. The sergeant's testimony and the tape recording of the lineup procedure show that the display of the photograph was momentary and that the witnesses were shown the photograph from a distance. All of the witnesses had previously seen the photograph. Furthermore, the testimony of Johnson, the key state witness because he was the only witness to identify Williams both at the lineup and at the trial, clearly shows that he made his identification from his memory of events at the 7–11 store rather than from the photograph.[7]

---

[7]The Supreme Court has enunciated a set of factors to be considered in evaluating the likelihood of misidentification because of suggestiveness in pretrial confrontation procedures for the purpose of determining the admissibility of testimony concerning out of court identifications. These include the witness' opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Neil v. Biggers,* 409 U.S. 188, 199, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972). Evaluating Johnson's testimony under these criteria, we are convinced that his identification of Williams was not influenced by his being shown the robbery photograph before the lineup.

Johnson testified that he saw Williams at the 7–11 store on September 25, 1978, from a distance of about 10 feet under bright lights for a period of from 2 1/2 to 3 minutes. A police report shows that Johnson was contacted by the police on the day of the robbery (before seeing the robbery photograph) and gave them a description of a man dressed like the man in the photograph.

Johnson further testified:

Q. Were you later interviewed by a detective of the Seattle Police Department concerning this incident?

A. Yes.

Q. And at that time were you shown a photograph of a possible suspect?

A. Yes, I was.

. . .

Q. And did you recognize the person in the picture?

A. Yes, I did.

Q. And who was that person?

A. The person at the 7–11 that night.

Finally, unlike the situation in *Simmons* and in most other cases discussing the pretrial showing of photographs to witnesses,[8] the lineup witnesses in the instant case were shown a photograph of a person taken by an automatic

---

Q. Did you have any question in your mind when you were shown the picture?

A. None at all.

. . .

Q. Did you later attend a five–person lineup on October 23, 1978?

A. Yes, I did.

Q. And did you select a person from that lineup as the person that you saw at the 7–11?

A. Yes.

Q. Do you recall what number that person was?

A. I believe he was number four.

Q. Showing you what is State's Exhibit No. 30, will you please look at that. Does that look familiar to you?

A. Yes, it does.

Q. Does it look like the lineup?

A. Yes.

Q. And can you tell the jury, did you select one of these people as the person that you saw at the 7–11 on the 25th of September?

A. Yes, I did. I picked number four.

Q. And tell the jury why you picked number four.

A. Because basically by the carriage, by the way he was standing, and his appearance, it was the person I saw at the 7–11.

Q. I want you to take your time and look around the courtroom and tell me if you see the person that you saw at the 7–11 that morning on the 25th of September, 1978.

A. Yes, I do.

Q. And can you please point him out for the jury and the Court.

A. The gentleman in the red shirt.

Ms. IBOSHI: Your Honor, can the record reflect—

MR. ALLEN: Your Honor, we will stipulate that he was referring to Clarence Williams.

Q. (By Ms. Iboshi) Now, is this selection from your memory of the person that particular night?

A. Yes, it is.

Q. And it's not just a recollection of the pictures that you have seen?

A. No, it isn't.

---

[8]*E.g., United States v. Cook*, 608 F.2d 1175 (9th Cir. 1979); *Hudson v. Blackburn*, 601 F.2d 785 (5th Cir. 1979); *United States v. Fried*, 436 F.2d 784 (6th Cir. 1971); *Crowder v. Oklahoma*, 590 P.2d 683 (Okla. Crim. App. 1979); *State v. Wheeler*, 22 Wn. App. 792, 593 P.2d 550 (1979); *State v. Thomas*, 9 Wn. App. 160, 510 P.2d 1137 (1973).

camera during the progress of a robbery—not a photograph known to be of the defendant. Such a photograph of an actual crime in progress should be an aid in preventing misidentification and so serve to exculpate rather than incriminate an innocent defendant.[9]

Consequently, given this strong evidence that the photograph did not influence the witnesses' identification, further cross–examination of Johnson on this point, even immediately following his direct testimony, could not have been fruitful. Another indication of the futility of additional cross–examination is evidenced by Johnson's testimony at the suppression hearing that he did not recall being shown the photograph at the lineup. The jury was fully informed of the showing of the photograph and Williams was able to elicit through cross–examination of the sergeant who showed the photograph the admission that this was an unusual procedure. Williams, thus, had material on which to base an argument to the jury that the showing of the photograph had influenced Johnson's identification. Williams does not make an offer of proof as to what he could have accomplished with an earlier opportunity to cross–examine Johnson about the lineup procedure. We are left with the inescapable conclusion that additional cross-examination of Johnson would have added nothing to Williams' case and that, therefore, the lack of an opportunity for earlier cross–examination on the lineup irregularity did not deprive Williams of a fair trial.

---

[9]This was essentially the conclusion of the court in *United States v. Grose,* 525 F.2d 1115 (7th Cir. 1975). There, a robbery in progress photograph of a bank robber was published in local newspapers. Eyewitnesses to the robbery saw the photograph in the newspapers several days before viewing a lineup in which they identified the defendant as the robber. The trial court denied a motion to suppress the identifications of these witnesses on the ground that the newspaper photograph was impermissibly suggestive. The Seventh Circuit, in affirming this ruling, observed that viewing the newspaper photograph "at most refreshed [the witnesses'] memories as to their own observations . . ." *United States v. Grose, supra* at 1118. *See United States v. Bridgefourth,* 538 F.2d 1251 (6th Cir. 1976).

■■ The trial court also abused its discretion in granting a new trial on the ground that the verdict in this case was "contrary to law and the evidence."

> "Law," as used in the ground for a new trial now under consideration, applies only to cases in which it can be seen that the verdict of the jury was contrary to the law as laid down by the court, or, in other words, against instructions.

*State v. Brent,* 30 Wn.2d 286, 289, 191 P.2d 682 (1948). Neither the court nor Williams claims the jury verdict in this case was contrary to the court's instructions. Therefore, the court erred in concluding that the verdict was "contrary to law." The court likewise erred in concluding the verdict was "contrary to the evidence." Disagreement with the jury's verdict is not a ground for awarding a new trial where that verdict is supported by substantial evidence. *State v. Collins,* 72 Wn.2d 741, 435 P.2d 538 (1967); *State v. Marks,* 71 Wn.2d 295, 427 P.2d 1008 (1967). Substantial evidence certainly supported the jury's verdict in this case. Eyewitness identification placed Williams at the 7–11 store at the apparent time of the robbery. Williams lived near the house where the body was found and had been in that house several times. He possessed clothing and glasses similar to those worn by the man pictured in the robbery in progress photograph. Most importantly, the jury had before it copies of the robbery photograph from which it was free to make its own determination of whether Williams was the man the photograph depicted. *See United States v. Bridgefourth,* 538 F.2d 1251 (6th Cir. 1976). In the face of this quantity of evidence, the trial judge was not free to substitute her judgment for that of the jury. To do so was an abuse of discretion.

■ Finally, we hold that the trial court abused its discretion in ordering a new trial on the basis that substantial justice was not done. The court gave no additional reasons for granting a new trial on this ground. Such an omission is contrary to CrR 7.6(d), which provides:

> In all cases where the court grants a motion for a new trial, it shall, in the order granting the motion, state whether the order is based upon the record or upon facts and circumstances outside the record which cannot be made a part thereof. If the order is based upon the record, the court shall give definite reasons of law and facts for its order. If the order is based upon matters outside the record, the court shall state the facts and circumstances upon which it relied.

Because the court failed to comply with this rule, we cannot sustain its award of a new trial for lack of substantial justice. *See State v. Collins, supra; Knecht v. Marzano,* 65 Wn.2d 290, 396 P.2d 782 (1964).[10]

---

[10]The *Knecht* court discussing the civil rule equivalent of CrR 7.6(d), observed at page 296: "On occasion, we have had the conviction that a trial judge was disguising a personal disagreement (possibly subconscious) with a jury result in his conclusion that substantial justice was not done. We have thought that this was a clear invasion of the province of the jury, and we have not hesitated to guard and to attempt to delineate clearly the boundary between the factual decision-making functions of the jury and the distinguishable functions of both the trial judge and the appellate court.

"However, it is desirable to avoid becoming too mechanistic in approach. We can foresee and understand occasions when a trial judge may say, 'The jury verdict is supported by sufficient evidence, but $X$ and $Y$ extra-record factors, singly or in combination, caused the jury to give far too much consideration to that evidence, which resulted in an unfair trial, and consequently a new trial must be granted because substantial justice had not been done.' In other words, on rare occasions, it might be possible for a trial to be derailed, resulting in the failure of substantial justice, when, on appellate review and under the present application of the rule, we would affirm the jury verdict. *In any event, what we must insist on, and what [former] Rule 50.04W requires, is an adequate explanation of the various extra-record factors which caused the jury to make a gross error. If these reasons are present in the order granting a new trial, then this court will undertake its duty to accord a fair review to the determination of the trial judge who witnessed the derailing of the normally adequate trial system.* In this way we will recognize and give proper effect to the functions of the trial and appellate courts and the jury. Most importantly, if the above procedure is followed, then our fears that trial courts could attenuate or water down the jury function will be reasonably obviated by reasonably operable appellate review, and the trial court and this court will not be parties to 'jury shopping'; rather, we will be giving the parties litigant their just due—a fair trial." (Italics ours.)

We find the remainder of Williams' contentions without merit.[11]

The trial court's order of a new trial is reversed and the jury verdicts reinstated.

JAMES, A.C.J., and DORE, J., concur.

Reconsideration denied December 2, 1980.

Review granted by Supreme Court February 26, 1981.

---

[11]Williams urges this court to remand this matter to the trial court for a fact–finding hearing to determine whether a piece of evidence gathered by the police since the trial presents another ground for a new trial. The evidence consists of the report of an interview in October of 1979 with a woman who said she was in the 7–11 store at the approximate time of the robbery. She was shown a montage of six photographs, including one of Williams, but was unable to identify any of the men pictured as a man she said she had seen inside the store.

We do not consider this interview, which occurred more than a year after the crimes, to be of sufficient significance to warrant remanding this case for a fact–finding hearing.

The defendant has also submitted a pro se brief in which he argues that he was misrepresented by his attorney, objects that the evidence against him was circumstantial, and disputes statements by the prosecution during closing argument. We find none of the defendant's contentions relevant to the issues with which this appeal is concerned.