## Richmond

### AARON LAMONT CURTIS

v.

### COMMONWEALTH OF VIRGINIA

No. 1597-88-2

Decided September 11, 1990

COUNSEL

Russell C. Williams, for appellant.

Birdie H. Jamison, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**DUFF, J.**—Aaron Lamont Curtis was tried September 29-30, 1988, on charges of malicious wounding and use of a firearm in the commission of a felony. The jury found Curtis guilty as charged and the judge, in accordance with the jury's verdict, sentenced him to ten years in the penitentiary on the charge of malicious wounding and two years for the use of the firearm. On appeal, Curtis contends that the court erred in permitting the victim to identify him, before the jury, as the man who shot him, knowing that the victim's identification may have been tainted by an improper out-of-court photograph identification. After consideration of the briefs, the record, and argument of counsel, we affirm the convictions.

I.

On February 27, 1988, Kevin Lee White attended a party held at the San Souci Apartments in Richmond, Virginia. As he was leaving the party he stopped and spoke to a friend, Chenella Jackson. Jackson's boyfriend approached White and pushed him into another person, Jerry Bassfield, a friend of White's. The situ-

ation escalated and a confrontation between White and several people ensued. Ultimately White was pushed into the pool.

After White climbed out of the pool he saw the defendant and another person "come from behind" the crowd and approach him. The defendant then shot White in the finger, arm and shoulder.

White was hospitalized as a result of his wounds. The following day he was visited by Detective Hutson, to whom he described his assailant as a black male, nineteen or twenty years old, five foot nine inches tall, with a slim build and short hair. Hutson showed White a side view photo of the appellant, identified the appellant by name, and asked White if this was the man who shot him. White stated that he did not know. Later that same day White contacted Hutson and told him that the person in the photo resembled the person who shot him.

A preliminary hearing was held on May 6, 1988. At that time White positively identified the appellant as his assailant as soon as he entered the courtroom.

Trial was held on September 29 and 30, 1988. At trial the appellant objected to any in-court identification by White. Out of the jury's presence, defense counsel represented to the trial court that the Commonwealth had agreed that White would not testify that the appellant was the man who shot him because the suggestive out-of-court photo identification had tainted White's ability to make an in-court identification.

The judge questioned White, who testified that his identification of the appellant was based upon seeing him in person at the preliminary hearing. The judge also questioned White concerning the photo identification at the hospital. White explained that his failure to identify the appellant initially was due to the fact that he had been on medication and also that he did not want to upset his mother, who was present in the room. White stated that he became certain that the appellant was the one who shot him when he saw him at the preliminary hearing. He further stated that his identification was based on seeing the appellant in person and not the photo. Based on this information the court allowed White's in-court identification of the appellant, finding from the evidence that White was relying not on the photograph, but on his own independent recollection.

## II.

 Initially we consider the out-of-court identification by White. The United States Supreme Court, in *Neil v. Biggers*, 409 U.S. 188 (1972), established a two-step test to determine the admissibility of an out-of-court identification. A court must first determine whether the identification process was unduly suggestive. *Biggers*, 409 U.S. at 198. In *Wise v. Commonwealth*, 6 Va. App. 178, 367 S.E.2d 197 (1988), this Court found the use of a single photo display to be one of the most suggestive methods of identification and impermissibly suggestive *per se. Id.* at 184, 367 S.E.2d at 200-201; *see also Hudson v. Blackburn*, 601 F.2d 785, 788 (5th Cir. 1979), *cert. denied*, 444 U.S. 1086 (1980). We find no exception here, and hold that the single-photograph display used by Detective Hutson was unduly suggestive.

 Under *Biggers*, we next must determine whether the out-of-court identification was nevertheless so reliable that no substantial likelihood of misidentification existed. 409 U.S. at 198. The factors for making this determination are:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199-200.

Viewing these factors in light of the evidence before us, we find that White had ample opportunity to view the appellant at the time of the crime. He testified that he saw the appellant approach him and that he made eye contact with him just prior to being shot. We also find that White displayed a seemingly normal degree of attention for someone in his circumstance and provided the police with a detailed description of his assailant prior to the photograph identification. We are unable to determine the accuracy of the victim's recollection, however, because there is no description of the appellant in the record other than that provided by White. We further find that White was unable, when first shown the photograph of the appellant, to identify him as the person who

shot him. Finally, we find that the length of time between the crime and the in-court identification was not so great as to raise significant concerns about memory loss.

The victim's inability to identify the appellant when first presented with his photograph is, in our opinion, critical. While mindful of the reasons offered by White for this lapse, we nevertheless feel that this lack of certainty, combined with our inability to verify the accuracy of his post-crime description of his assailant, is sufficient to make the out-of-court identification unreliable.

## III.

We next turn to the admissibility of the in-court identification made by White. This Court stated in *Hill v. Commonwealth*, 2 Va. App. 683, 347 S.E.2d 913 (1986), that "even if evidence of the out-of-court identification cannot be admitted, an in-court identification may still be made if the origin of that identification is independent of the inadmissible out-of-court identification procedure." *Id.* at 693, 347 S.E.2d at 918. The appellant contends that nothing in the record separates the in-court identification from the out-of-court identification. Thus, he argues, the in-court identification is not "independent" and therefore is not admissible. We disagree.

In *Wise v. Commonwealth*, 6 Va. App. 178, 367 S.E.2d 197 (1988), we dealt with a similar argument. After ruling that out-of-court identifications made by two witnesses were inadmissible, we reviewed their in-court identifications. In both cases, we held that the identifications were not independent of the tainted out-of-court identifications. Our findings were based on the hesitant and uncertain nature of the testimony of the witnesses, as elicited by counsel for the defense on cross-examination, and the references by both witnesses to the pictures used.

When White first viewed the single photograph of appellant, he was unable to make a positive identification. We have already held that this uncertainty renders his subsequent out-of-court identification inadmissible. With regard to the in-court identification, however, we find no evidence of similar uncertainty. White's unimpeached testimony was that he had eye-to-eye contact with his attacker, that he positively identified the appellant as his assailant when he saw him at the preliminary hearing, that his in-

court identification was based entirely upon his observations at the time of the shooting and that the photograph of the defendant was not the source of the identification.

The United States Supreme Court, in *Manson v. Brathwaite*, 432 U.S. 98 (1977), stated that evidence such as that presented here:

> is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature . . . [t]he defect, if there be one, goes to weight and not to substance.

432 U.S. at 116-17.

We hold that the suggestive photographic display affects only the weight to be given the later in-court identification, not its admissibility. Based on the evidence presented to us, we find that White's in-court identification of the appellant had all of the necessary indicia of independence and reliability so as to permit its introduction into evidence.

For the foregoing reasons, we affirm.

*Affirmed.*

Coleman, J., concurred.

Benton, J., dissenting.

Because of the suggestive photograph identification, the Commonwealth's attorney and defense counsel reached an agreement that the victim would not identify Aaron Lamont Curtis as the person who shot him. The Commonwealth was prepared to try Curtis without the identification. However, as the victim was testifying on direct examination at trial the following discussion occurred:

> A: Well, after that I fell into the pool. It was like maybe from where I am to the jury. And, I saw Adriane Roane and Curtis come from behind.

[DEFENSE COUNSEL]: Objection, your Honor. May we take it up out of the presence of the jury?

THE COURT: What is the problem.

[COMMONWEALTH'S ATTORNEY]: It is something I stipulated to prior to the hearing. If we can just take it up outside of the presence of the jury.

* * *

JURY OUT

THE COURT: All right.

[COMMONWEALTH'S ATTORNEY]: I would like to instruct the witness not to say Mr. Curtis was the man that shot him. The reason being we have a possibly tainted identification from a photo spread. So, I had agreed with [defense counsel] this man would not testify as to who shot him, just someone shot him.

The trial judge refused to instruct the witness as requested by the Commonwealth's attorney. Instead, the trial judge conducted a suppression hearing while the jury was out and ruled that the victim's testimony would not be restricted. I believe that the trial judge erred and that Curtis is entitled to a new trial.

I agree with the majority that the photographic identification of Curtis by the victim was unduly suggestive. Under the circumstances of this case, the use of a single photograph and the use of the subject's name when presenting that photograph were impermissibly suggestive, unnecessary, and inexcusable. The "central question" thus becomes, "whether under the 'totality of the circumstances' the identification was reliable even though the [identification] procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199 (1972). Contrary to the majority, I believe that the evidence in this record does not support the conclusion that the out-of-court identification was "nevertheless so reliable that no substantial likelihood of misidentification existed." *Wise v. Commonwealth*, 6 Va. App. 178, 184, 367 S.E.2d 197, 201 (1988).

[R]eliability is the linchpin in determining the admissibility of identification testimony. . . . The factors to be considered . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level

of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) (citing *Biggers*, 409 U.S. at 199-200). An analysis of these factors based on the facts of this case weighs against the admissibility of the victim's in-court identification of Curtis.

The record establishes that, prior to the shooting, the victim was attending a party in the clubhouse of an apartment complex. The victim left the party, went to his automobile, and returned to the party to offer a ride to a young woman. Soon, the victim was engaged in an angry confrontation with the woman's boyfriend and "a whole bunch of guys." As the victim and one of his male friends were being hit and pushed out of the building, many of the other guests in the large crowd began to run. During the commotion the victim was pushed into the pool. As he was getting out of the pool, he was shot.

The victim's opportunity to view his assailant was limited by both the lighting conditions and by the speed of events. The shooting occurred at 11 p.m. outside the building where the party was held. The area by the pool was illuminated only by street lights and lights along the walkway. The victim testified that the person who shot him was across the pool and "came from behind someone." The victim's opportunity to view his assailant was "maybe four seconds, maybe three seconds" and occurred at a time when the victim was attempting to defend himself from the persons who had beaten him and pushed him into the pool. He did not know Curtis and had not seen Curtis earlier that evening at the party. Curtis was not among the people arguing with him, Curtis had not hit him or his friend, and Curtis had not been among the people who pushed him into the pool.

There is no evidence to support the majority's statement that the victim "displayed a seemingly normal degree of attention for someone in his circumstance." The victim and his friend had been pummelled by a large group of persons. The victim had been shoved into the swimming pool during the melee and was getting out of the pool in the presence of the combatants. All of the witnesses testified that the party was crowded and that people were

running about. One witness testified that ten or eleven people displayed guns after the shooting began. Whatever may be considered a "normal degree of attention" under those conditions, the record contains no evidence to suggest that the persons across the pool from the victim were more likely to garner his attention than those who were in the immediate area where he had been pushed in the pool. Under the circumstances that prevailed, even if the victim saw his assailant for three or four seconds in the crowd of people across the pool from him, it is not probable that he was viewing the individual people, who were not engaged in the combat, for purposes of later identification.

Furthermore, the victim's description of his assailant was vague and inconclusive. Four days after the incident, when a police officer visited the victim in the hospital, the victim stated that the person who shot him was a black male about nineteen or twenty years of age, as were most of the males at the party. He further described the assailant as five feet, nine inches tall, slim, and wearing his hair short. The record does not reflect whether those descriptions fit Curtis. The only other characteristic of the assailant that the victim described was that the assailant was wearing "some type of jacket." No further description was made of the jacket to distinguish it from the jackets that others presumably were wearing at 11 p.m. on a February night. Moreover, it is clear that the victim's generic description of his assailant was not a factor enabling the police to identify and locate Curtis. At the same time that the victim gave the description, he viewed Curtis' picture and denied that Curtis was the assailant.

The victim was certain that Curtis *was not* his assailant when the police officer interviewed him in the hospital, showed him a photograph of Curtis, and gave him Curtis' name. The victim posits two reasons why he did not identify the Curtis photograph. First, he contends that he was under the influence of pain medication. Significantly, the officer who interviewed the victim said he was not sleepy and noticed nothing unusual about him during the interview. Assuming that the victim's perceptions were distorted by the pain medication, there is every reason to believe that his description of the assailant as "black male, nineteen or twenty years old, five foot nine inches tall, slim build, short hair" was equally distorted. Moreover, if his perception was distorted by pain medication during the interview, the Commonwealth offers

no explanation for the victim's revelation five hours later when he telephoned the police officer who interviewed him to say that the person whose picture he viewed five hours earlier "resembled the guy that [he] saw."

The victim gave another dubious reason for his failure to identify Curtis' picture during the hospital interview. He testified that he did not wish to upset his mother, who was present. Thus, despite the victim's claim that the medication interfered with his perception, he contends that he had enough presence of mind to be concerned about upsetting his mother by making an identification. This interview with the police officer occurred four days after the shooting. While his mother was present, the victim recounted for the police officer all the details of the incident, gave a verbal description of the assailant, and responded negatively when asked if he knew the name "Aaron Curtis." It is difficult to discern how the victim's identification of the photograph of the person whom he says shot him could have increased his mother's anxiety. Moreover, the victim's professed solicitousness for his mother's feelings is belied by his other reason for not identifying the photograph — that his perceptions were so distorted by the pain medication that he was unable to react rationally.

The victim's assertion that Curtis was not his assailant coupled with the lack of descriptive features given to the police significantly detract from the Commonwealth's claim that the later in-court identification was reliable and independent of the suggestive imprinting of Curtis into the victim's consciousness through the use of a single photograph and the name of the subject. The analysis demonstrates that all the *Biggers* factors unerringly lead to the conclusion that the in-court identification was tainted by the suggestive out-of-court identification. After viewing the photograph, the victim next saw Curtis several months later when Curtis was in court at his preliminary hearing. The victim testified that when he saw Curtis at the preliminary hearing, "that is when I knew it was him." Thus, the victim's identification evolved from a complete failure initially to identify Curtis, to a statement that the photograph of Curtis "resembled the guy," and then to a proported realization several months later that Curtis was the assailant. The victim's in-court identification was inextricably linked to the suggestive single photograph identification and has no "origin independent of the inadmissible out-of-court identification." *Wise,*

6 Va. App. at 186, 367 S.E.2d at 202.

For these reasons, I would hold that the trial judge erred in refusing to grant the Commonwealth's motion to instruct the victim, in accordance with the parties' stipulation, not to testify that he saw Curtis shoot him. Accordingly, I would reverse and remand for a new trial.