COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Felton, Judges Benton and Petty
Argued at Richmond, Virginia


PIPER ANN ROUNTREE

MEMORANDUM OPINION[*] BY
v.       Record No. 0155-06-2       CHIEF JUDGE WALTER S. FELTON, JR.
                                    JULY 24, 2007

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HENRICO COUNTY
L.A. Harris, Jr., Judge

David B. Hargett (Hargett & Watson, PLC, on brief), for appellant.

Susan M. Harris, Assistant Attorney General (Robert F. McDonnell,
Attorney General, on brief), for appellee.


A jury convicted Piper Ann Rountree (appellant) of first-degree murder in violation of Code

§ 18.2-32 and use of a firearm during the commission of a felony in violation of Code § 18.2-53.1.

On appeal, she argues the trial court erred in denying her motion to suppress several out-of-court

and in-court identifications based on a single photograph display that was shown to each witness

during the police investigation.  Appellant contends that "[e]ach of the out-of-court identifications

were not so reliable as to overcome the overly suggestive nature of the police practices in this case."

She further contends that the in-court identifications made by the witnesses were inadmissible

because they were not independent of the overly suggestive out-of-court identifications.  For the

following reasons, we affirm the judgment of the trial court.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

I.  BACKGROUND

On the morning of October 30, 2004, Fredric Mark Jablin was shot and killed in his driveway while retrieving a newspaper in the pre-dawn darkness.  Investigators from the Henrico County Police Department immediately developed appellant, Jablin's former wife, as a suspect and retraced her activities from October 21 to October 30, 2004.  During the course of their investigation, investigators showed one of three casual photographs of appellant to several individuals who had come in contact with a woman identifying herself as Tina Rountree.[1]  The photograph of appellant shown to witnesses in Houston, Texas, was a color, close-up shot, taken outdoors with good light, in which appellant's facial features were clearly displayed.  Appellant was wearing a sleeveless red top, and had shoulder-length, sandy blonde hair.  Investigator Colby Kelley testified that the photograph was pulled from the wall in one of the children's bedrooms at the victim's home.  The photograph shown to witnesses in Williamsburg and Norfolk was also a color photograph.  In that photograph, appellant, with shoulder-length, sandy blonde hair, was sitting on a curb looking at the camera, wearing a blue top.  The photograph shown to witnesses in the Richmond area was a black and white copy of the photograph of appellant sitting on the curb.  None of the photographs were dated, and appellant does not contest the authenticity or the accuracy of the photographs.

Seven of the individuals interviewed identified appellant as the woman each had encountered in either Texas or Virginia in the days immediately preceding the shooting and on the day of the shooting.  Prior to trial, appellant moved to suppress the identification testimony of these individuals contending that the single photograph shown to each witness was overly suggestive and would taint any in-court identifications.  At the suppression hearing, the Commonwealth conceded

---

[1] Tina Rountree is appellant's sister who is eight years older than appellant.  She was initially arrested for shooting Jablin, but was subsequently released.

- 2 -

that the use of a single photograph was suggestive, but argued that the out-of-court identifications were nevertheless so reliable that no substantial likelihood of misidentification existed. It further argued that it was not necessary to determine whether the in-court identifications were independent of the pre-trial identifications unless the trial court found the out-of-court identifications to be unreliable.

The trial court overruled appellant's motion to suppress the identification testimony of each of the seven witnesses, holding that

> when you look at the totality of all these [identifications], I, I see nothing in the out-of-court procedure that would lead to a substantial likelihood of a misidentification. There obviously are discrepancies that go to the weight, certainly the trier of fact will consider them, but as far as the admissibility, I see nothing that would keep them from being admitted.

The trial court further held that it saw "nothing from the out-of-court I.D.s that would lead to the inadmissibility . . . of an in-court I.D."

At trial, the Commonwealth's evidence established that appellant purchased two wigs, one blonde and one red in color, from an online merchant on October 21, 2004, nine days prior to the shooting death of Jablin. The wigs were "long" in length. The Commonwealth's evidence also placed appellant at a gun range in Houston, Texas on October 26, 2004, practicing shooting. Two days later on October 28, 2004, appellant purchased a roundtrip ticket, in the name of her sister, Tina Rountree, using Tina's identification, departing that same day from Houston's Hobby Airport to Norfolk. Appellant declared a firearm for the flights to Norfolk. Upon arriving in Norfolk, appellant rented a van, again using Tina Rountree's identification, and drove to a suburb of Richmond where she spent the next two nights in a local motel. On the morning of October 30, 2004, appellant drove from the Richmond area back to Norfolk, stopping for gas in Williamsburg. She returned the rental van in Norfolk before flying back to Houston that same day.

Appellant, testifying in her defense, described herself as five feet, three inches to five feet, four inches in height, weighing 103 pounds with dark, short hair.[2] She admitted to purchasing the two wigs online, but claimed she bought them for a Halloween party. She also testified that she "rented some guns to go do target practice" at the 59 Gun Range the afternoon of October 26, 2004. Appellant told the jury that she was in Galveston, Texas on October 28-29, 2004. However, no evidence in the record corroborates or substantiates her presence there during that time period.

The jury found appellant's testimony to be incredible and returned guilty verdicts on both charges. It also fixed her sentence at life imprisonment, plus three years. The trial court sentenced appellant in accordance with the jury's sentence. This appeal followed.

## II. ANALYSIS

On appeal of a denial of a motion to suppress, we consider the evidence adduced at both the suppression hearing and the trial, DePriest v. Commonwealth, 4 Va. App. 577, 583, 359 S.E.2d 540, 542-43 (1987), and we view it in the light most favorable to the Commonwealth, the party prevailing below. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). "[W]e are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*). However, we review *de novo* the trial court's application of legal standards to the particular facts of the case. Ornelas v. United States, 517 U.S. 690, 699 (1996).

### A. Out-of-Court Identifications

Appellant first contends that each of the seven witnesses' out-of-court identifications was unreliable as a result of the investigators' unduly suggestive photograph identification procedure, and, therefore, should not have been admitted as evidence at trial.

---

[2] We note that this self-description is the only one of appellant in the record presented to us on appeal. No explanation is given as to why appellant's hair at the time of trial differed in length and color from the photographs used by Henrico County investigators.

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." Blevins v. Commonwealth, 40 Va. App. 412, 423, 579 S.E.2d 658, 663 (2003) (citing Brickhouse v. Commonwealth, 208 Va. 533, 536, 159 S.E.2d 611, 613-14 (1968)), aff'd on other grounds, 267 Va. 291, 590 S.E.2d 365 (2004). An out-of-court identification "'will be admitted if either (a) the identification was not unduly suggestive, or (b) the procedure was unduly suggestive, but the identification is nevertheless so reliable . . . that there is no substantial likelihood of misidentification.'" Miller v. Commonwealth, 7 Va. App. 367, 373, 373 S.E.2d 721, 724 (1988) (quoting Hill v. Commonwealth, 2 Va. App. 683, 693, 347 S.E.2d 913, 918 (1986)).

The Commonwealth does not dispute that the use of a single photograph in its pre-trial identification process was suggestive. See Wise v. Commonwealth, 6 Va. App. 178, 184, 367 S.E.2d 197, 200 (1988) ("'[A] single photograph display is one of the most suggestive methods of identification and is always to be viewed with suspicion.'" (quoting Hudson v. Blackburn, 601 F.2d 785 (5th Cir. 1979))). The inquiry on appeal, therefore, is whether the out-of-court identification was "'nevertheless so reliable . . . that there is no substantial likelihood of misidentification.'" Miller, 7 Va. App. at 373, 373 S.E.2d at 724 (quoting Hill, 2 Va. App. at 693, 347 S.E.2d at 918). In evaluating the reliability of a suggestive identification, we look to the totality of the circumstances and consider factors including:

> the opportunity of the witness to view the criminal at the time of the [confrontation], the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation and the length of time between the crime and the confrontation.

Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

The application of this standard to the out-of-court identifications of each of the seven witnesses supports the trial court's finding that the identifications were not so unreliable that there was a substantial likelihood of misidentification.

## 1. Totality of the Circumstances

We begin our analysis by considering the unique circumstances surrounding each of the seven witnesses' out-of-court identifications. Unlike a typical photograph display, the single photograph investigators showed each of the witnesses was a casual picture of appellant, not a police mug shot that would suggest that appellant had been arrested for perpetrating a crime or that she was a suspect in the police investigation. Similarly, investigators did not inform the witnesses of the nature of their investigation while conducting their interviews or showing the photograph. See Simmons v. United States, 390 U.S. 377, 383 (1968) ("The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime."). Moreover, none of the witnesses were victims of appellant's crime, and thus, had the opportunity to observe her in the less stressful settings of their employments. Consequently, the witnesses' responses to the photograph were less likely to be biased. With consideration of the neutrality of the circumstances surrounding each of the seven single photograph displays, we turn to the application of the factors set forth in Biggers to each of the witnesses' out-of-court identifications.

## 2. Witness Testimony

### *Kathleen Molley*

The record reflects that Molley, a Southwest Airlines ticket agent at Houston's Hobby Airport, had abundant opportunity to observe appellant. Molley spent ten to fifteen minutes assisting appellant with first purchasing a ticket for same-day travel to Norfolk, and then checking her in for the flight. The lighting in the ticketing area was bright, and appellant was standing on the

other side of the ticket counter, only a couple of feet in front of her. Molley did not interact with other customers during the time she was assisting appellant.

Molley paid close attention to appellant. After learning appellant was traveling under the name of Tina Rountree, Molley told appellant the name was "cute." Appellant also drew Molley's attention by declaring a firearm and then failing to comply with Molley's numerous requests to produce the firearm for inspection. When appellant finally opened her luggage to retrieve the case in which the firearm was locked, Molley complemented appellant on a pair of shoes she had packed.

On November 3, 2004, five days after she sold appellant the ticket to Norfolk, Molley described appellant to Investigator Kelley as a petite, attractive Caucasian woman, approximately five feet, two inches tall with shoulder length golden blonde hair that appeared natural. Although Molley's description of appellant's hair length and color is not entirely accurate, the differences between her description and appellant's actual appearance "went to the weight, not the admissibility, of her identification evidence." Satcher v. Commonwealth, 244 Va. 220, 249, 421 S.E.2d 821, 839 (1992). Moreover, when Investigator Kelley showed Molley the single photograph of appellant and asked her if appellant resembled the woman to whom she sold the ticket to Norfolk, Molley immediately said, "Yes." Molley testified at trial that she was "absolutely positive" that the woman in the photograph was the woman to whom she sold the ticket to Norfolk.[3]

---

[3] The dissent argues that Molley's inability to identify appellant at the suppression hearing "weighs heavily against any indicia of Molley's attentiveness or certainty about the encounter she had with a woman at the airport," and, therefore, rendered her out-of-court identification of appellant unreliable. We disagree. Although Molley was unable to identify appellant at the suppression hearing as the woman she assisted on October 28, 2004, at trial she attributed her failure to do so to the fact that she had been looking for a woman with light blonde, not dark hair. Also at trial, Molley positively identified appellant after the two women stood approximately one foot apart from one another. Molley testified at trial that appellant's height and "[s]eeing the shape of [appellant's] face" at close range helped her to make the positive identification. She testified appellant's hair at the suppression hearing and at trial was different in color and style from how she wore it at the airport on October 28, 2004. Molley's explanation for her inability to identify appellant at the suppression hearing, as well as her cautionary approach to identifying appellant at trial, illustrates the strength of Molley's attentiveness to

From the record presented to us on appeal, we conclude that Molley's out-of-court identification was sufficiently reliable under the Biggers factors to support the trial court's finding that there was no substantial likelihood of misidentification of appellant as the person she assisted.

*Allan Benestante*

Benestante, a baggage screener at Houston's Hobby Airport for the Transportation and Security Administration (TSA), also had ample opportunity to observe appellant. Benestante stood "shoulder to shoulder" with appellant for three to five minutes while she completed her transaction with Molley, and then spent another 90 seconds inspecting her firearm. He did not assist any other travelers during that time. His testimony, at both the suppression hearing and trial reflects that appellant stood out in his mind because females seldom declare firearms. His testimony substantiates that he paid close attention to appellant during their encounter.

Benestante described the female passenger declaring a firearm as a petite, middle-aged, Caucasian woman with shoulder length "[d]ark brownish" to dark-blonde hair, standing five feet, eight inches tall. Although Benestante's description of appellant was not completely consistent with that of Molley's, any discrepancies in his description go to the weight of his identification testimony, not its admissibility. See Satcher, 244 Va. at 249, 421 S.E.2d at 839.

---

appellant at the airport. Had Molley been less attentive, she would not have looked for the specific characteristics of appellant's appearance she observed at the airport when asked to make the in-court identifications. Given that appellant's hair color and style differed dramatically from Molley's description of appellant, Molley's cautionary approach to identifying appellant at the suppression hearing and at trial does not, under the totality of the circumstances, render her out-of-court identification so inattentive and uncertain as to be unreliable under Biggers.

The dissent also asserts that Molley's reference to the photograph after positively identifying appellant at trial indicates the likelihood of her misidentification was increased by the unduly suggestive viewing of the photograph. The dissent, however, mistakenly blurs the line between the admissibility of out-of-court and in-court identifications. The independent nature of Molley's in-court identification is only relevant to an inquiry into the reliability of the in-court identification, and, therefore, has no bearing on the reliability of her out-of-court identification. See Hill, 2 Va. App. at 693, 347 S.E.2d at 918.

After concluding his interview with Molley on November 3, 2004, Investigator Kelley spoke with Benestante. Kelley showed Benestante a single photograph of appellant and asked him if he recognized the woman in the photograph as the passenger they had been discussing. Benestante replied that appellant "looked like the passenger in question, but [he] c[ould not] be a hundred percent sure." However, on November 9, 2004, after watching a story related to appellant's arrest on the local evening news, he telephoned Kelley and reported that the individual shown in that newscast was, with absolute certainty, the female passenger he observed during the firearm check.

Benestante's failure to identify appellant with one hundred percent certainty after viewing the single photograph does not render his out-of-court identification inadmissible. The record reflects that Benestante was able to identify appellant with sixty-five percent certainty after viewing the photograph. See, e.g., Curtis v. Commonwealth, 11 Va. App. 28, 32, 396 S.E.2d 386, 388 (1990) ("*inability* to identify the appellant when first presented with his photograph is . . . critical" to reliability determination (emphasis added)). He explained that his degree of certainty stemmed from the fact that appellant's "cheekbones and eyes looked the same, but her hair was obviously a different color . . . and . . . the picture was a few years earlier than the actual person . . . ." See, e.g., Smallwood v. Commonwealth, 14 Va. App. 527, 532, 418 S.E.2d 567, 570 (1992) (fact that "no explanation as to why [witness] became more positive between the preliminary hearing and the trial . . . raises questions about her trial testimony"). Moreover, Benestante was able to identify appellant from her appearance on the local evening news with complete certainty several days later. He explained at the suppression hearing that his degree of certainty improved after viewing the news program because the video taken the day appellant was arrested looked more like the passenger who had declared the firearm, than did the single photograph in which appellant appeared younger and with hair that was different in both color and style.

Benestante's identification of appellant as the person he encountered at the airport, and his attention to detail in noticing that appellant's eyes and cheekbones appeared similar to the passenger he assisted, coupled with his observation that appellant appeared younger in the photograph than she did during the encounter, gives significant weight to the reliability of his out-of-court identification. Therefore, the substantial likelihood of misidentification was diminished. Accordingly, we conclude Benestante's out-of-court identifications of appellant were sufficiently reliable under Biggers to be admitted as evidence at trial.

### *Boyd Adams*

Adams, a part-time employee at the 59 Gun Range in Houston, Texas had two opportunities to observe appellant on October 26, 2004. Adams was working the counter when a woman and her male companion entered the gun range. Although Adams did not assist the woman and her companion, he overheard appellant tell another employee that she had photo identification with her, but that it belonged to her sister. The woman's statement caused Adams to divert his attention away from the customer he was assisting and focus on her. Adams was three feet from the woman while she and her companion purchased ammunition. After approximately five minutes, the woman and her male companion left the counter area and proceeded to the range. Subsequently, Adams was called to assist the couple with a target malfunction. He spent another five minutes in the woman's presence while repairing the malfunction.

In addition to the woman's statement that she could not produce photo identification verifying her identity, Adams testified that the woman captured his attention because she was "nice looking." He described her as a dark blonde Caucasian about five feet, nine inches tall, but "[s]mall." Although Adams' description was partially inconsistent with appellant's description of herself at trial, any such discrepancies go to the weight, not the admissibility, of his out-of-court identification of appellant. Satcher, 244 Va. at 249, 421 S.E.2d at 839.

Investigator Kelley initially spoke with Adams and his co-workers on November 9, 2004, eleven days after Adams' encounter with appellant and her male companion at the gun range. During that meeting, Kelley showed Adams and his co-workers a single photograph of appellant, but did not specifically ask Adams if the person in the photograph was a person he had seen at the gun range. Kelley formally interviewed Adams on December 4, 2004, and again showed Adams the single photograph of appellant, after which Adams identified appellant with ninety-five percent certainty as the woman he encountered at the gun range.[4] While Adams identified appellant from the photograph thirty-nine days after he observed her and her male companion, "the lapse of time alone is not sufficient to render an identification unreliable as a matter of law." Id.

Adams' high degree of certainty combined with appellant's testimony at trial that she had been to the 59 Gun Range with a male friend on October 26, 2004, renders Adams' out-of-court identification sufficiently reliable such that no substantial likelihood of misidentification existed.

*Tina Landrum*

Our review of the record shows that Landrum, an assistant manager at a convenience store in Williamsburg, Virginia, also had a sufficient opportunity to observe appellant the morning of October 30, 2004. Landrum and her co-worker were alone in the convenience store when appellant entered and browsed the "junk aisle" before walking back to the beer cooler. Landrum smelled a strong odor of alcohol emanating from appellant and instructed her co-worker not to sell appellant any alcohol. After looking over the beer selection, appellant approached the ATM and inserted a

---

[4] The dissent asserts that "Adams's professed levels of certainty and attention were refuted by the investigator, who testified Adams did not identify the photograph when the investigators first went to the firing range fourteen days after the woman had been there." Investigator Kelley's failure to obtain an out-of-court identification of appellant from Adams on November 9, 2004, "while a factor to be weighed by the jury in considering the evidence, did not render the [out-of-court] identification testimony inadmissible." McCary v. Commonwealth, 228 Va. 219, 234, 321 S.E.2d 637, 645 (1984). Moreover, appellant's testimony at trial that she had been to the gun range October 26, 2004, corroborated Adams' out-of-court identification.

card.  When the card was rejected, appellant asked Landrum and her co-worker if they knew the maximum amount she could withdraw.  Landrum replied she did not -- that the amount was set by the cardholder's bank.  Landrum watched as appellant successfully completed a second transaction at the ATM and then exited the store.  Landrum's detailed account of the appellant's activities while in the store illustrates the high degree of attention she paid to her.

On November 1, 2004, two days after appellant visited the convenience store, Landrum described the woman to Detective Holsinger as a Caucasian female with dirty blonde, shoulder length hair.  Landrum approximated appellant's height at somewhere between five feet, five inches and five feet, seven inches tall and weight between 125 and 140 pounds.  Any discrepancies in Landrum's description of appellant go to the weight of her out-of-court identification, not its admissibility.  Satcher, 244 Va. at 249, 421 S.E.2d at 839.

During the November 1, 2004 meeting, Holsinger showed Landrum a single photograph of appellant.  Landrum, without any hesitation, positively identified appellant as the woman who had entered the convenience store "drunk" two mornings before.  At the suppression hearing and at trial, Landrum explained that she was ninety-nine percent certain of her identification of appellant from the photograph because appellant was not a regular customer.[5]

Given Landrum's opportunity to observe appellant without the distractions of other customers in the store, the high degree of attention Landrum paid appellant due to her apparent intoxication and activities at the ATM, and the degree of certainty with which she positively

---

[5] The dissent argues that Landrum's "level of certainty, degree of attention, and accuracy of description were . . . minimal" because "she was unable to identify [appellant] at the suppression hearing."  We disagree.  Landrum identified appellant from the single photograph Detective Holsinger showed her "[i]nstantly" with "[n]o hesitation" two days after she observed appellant in the convenience store.  Thus, Landrum's inability to positively identify appellant at the suppression hearing, held on January 28, 2005, nearly three months after the encounter, does not render her out-of-court identification on November 1, 2004 unreliable.

identified appellant from the photograph, we conclude Landrum's out-of-court identification was sufficiently reliable to preclude any substantial likelihood of misidentification.

*Tarra Watford*

On October 28, 2004, Watford, an employee at a car rental business in Norfolk, spent approximately eight minutes with appellant while appellant completed the necessary paperwork to rent a 1998 red van. Because there were no other customers or employees in the rental office, Watford paid close attention to appellant as she answered appellant's questions and facilitated the rental paperwork. Watford testified that appellant stood out from the customers she had assisted in the past because the agency rarely rented vehicles to Caucasian females, and because appellant was wearing a wig and heavily applied make-up.

Watford's high degree of attention enabled her to give a detailed description of appellant. She described the rental customer as a Caucasian woman, five feet, one inch to five feet, two inches tall, with a small frame. She also approximated appellant's weight to be 116 pounds.

Investigator Dorton interviewed Watford on November 4, 2004, six days after appellant rented the van. During the interview he showed Watford a single photograph of appellant. Watford told Dorton that she thought the rental customer looked like appellant, but that appellant looked "bigger" in the photograph.

We conclude from the record that Watford had ample opportunity to observe appellant during the rental transaction. She paid a high degree of attention to appellant, demonstrated by her statement to Dorton that appellant was wearing a wig and heavily applied make-up. Moreover, Watford's description of appellant's height and weight was reasonably accurate. We conclude, therefore, that Watford's out-of-court identification of appellant was sufficiently reliable pursuant to the factors set forth in <u>Biggers</u> so that no substantial likelihood of misidentification existed.

*Raymond Seward, Jr.*

Seward, the owner of the car rental business in Norfolk from which appellant rented the 1998 red van, also had ample opportunity to observe appellant when she returned the van shortly after 9:00 a.m. on October 30, 2004. Seward spent five minutes assisting appellant return the van and securing her a ride to the Norfolk airport, located a short distance from the rental business. He testified that she captured his attention because the business rarely has Caucasian customers, and because she was an attractive woman. No other customers or employees were present in the rental office during that time to divert Seward's attention from appellant.

Seward described appellant as an attractive, medium-sized, Caucasian female in her forties with shoulder-length blonde hair. Although Seward did not approximate appellant's height and weight, his failure to do so does not render his out-of-court identification inadmissible. See Satcher, 244 Va. at 249, 421 S.E.2d at 839. Moreover, when Investigator Dorton showed Seward the single photograph of appellant on November 4, 2004, Seward did not hesitate in identifying appellant as the woman who had returned the rental van on October 30, 2004.[6] Accordingly, we conclude that Seward's out-of-court identification of appellant was sufficiently reliable under Biggers so that no substantial likelihood of misidentification existed.

_____

[6] We disagree with the dissent's conclusion that Seward's failure to identify appellant at the suppression hearing rendered his out-of-court identification unreliable. When presented with the photograph of appellant on November 4, 2004, Seward immediately identified her, with absolute certainty, as the woman who returned a red van the morning of October 30, 2004. Seward explained at trial that he "never got a look at her face [at the suppression hearing]. She . . . had her head down and she wrote the entire time [he] was looking over [at her]." He further stated that he had "thought it was her, but [he] couldn't be sure, so [he] didn't want to say [at the suppression hearing] [that] [he] kn[e]w [it] was her . . . ." Considering the totality of the circumstances surrounding Seward's encounter with appellant when she returned the van, and his cautionary approach in identifying appellant in court does not render his out-of-court identification so unreliable that a substantial likelihood of misidentification existed.

*Tamiko James*

James, the manager of a motel in the Richmond suburb of Glen Allen, was on duty at the front desk the evening of October 28, 2004, when a woman checked-in under a reservation in the name of Tina Rountree. During the course of the check-in process, the woman asked that the room be registered in the name of Jerrilyn Smith. James complied with her request, and checked the woman into Room 171. Although the transaction took only two to three minutes, the check-in counter was well lit, and no other customers were present. In addition to the woman's request to check-in under a name different than the name listed on the reservation, the woman's attire attracted James' attention. Despite warm weather, the woman was wearing a bulky coat, scarf, and hat, which James thought was odd. Although the outerwear obscured some of the woman's features, James was able to describe the woman as a thin Caucasian, five feet, two inches to five feet, three inches tall and weighing approximately 120 pounds.

On November 4, 2004, Detective Hannah interviewed James. During the interview, he showed her a single photograph of appellant. James, without hesitation, identified appellant as the woman she checked into the motel under the name of Jerrilyn Smith.

Applying the Biggers factors, the record reflects James had ample opportunity to observe appellant and that appellant's name change request and appearance caused her to pay close attention to appellant. Moreover, James' description of appellant's height and weight was accurate, and she identified appellant with great certainty. Accordingly, we conclude James' out-of-court identification of appellant was sufficiently reliable, and, therefore, no substantial likelihood of misidentification existed.

## 3. Conclusion

From our review of the record, we conclude that the trial court did not err in admitting the out-of-court identifications of the seven witnesses. We acknowledge that discrepancies exist in the

- 15 -

witnesses' descriptions of appellant's physical appearance and that three of the witnesses who made positive out-of-court identifications were unable to identify appellant at the suppression hearing. However, "evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable features." Manson v. Brathwaite, 432 U.S. 98, 116 (1977). "'Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification – including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi.'" Watkins v. Sowders, 449 U.S. 341, 348 (1981) (citations omitted). Thus, any inconsistency in the witnesses' descriptions of appellant or in their in-court identifications, given the neutrality of the circumstances surrounding each of the single photo displays and the evidence establishing that appellant attempted to disguise her physical appearance, "went to the weight, not the admissibility, of her identification evidence." Satcher, 244 Va. at 249, 421 S.E.2d at 839. The trial court, therefore, did not abuse its discretion denying appellant's motion to suppress the out-of-court identifications of the seven witnesses.

In-Court Identifications

Appellant next contends that the trial court erred in admitting the witnesses' in-court identifications, arguing that each of the in-court identifications was "tainted" by the witnesses' out-of-court identifications. However, it is well settled that an in-court identification "following a pretrial identification by photograph should only be suppressed when the photographic identification procedure is so impermissibly suggestive as to give rise to the very substantial likelihood of misidentification." United States v. Johnson, 114 F.3d 435, 441 (4th Cir. 1997) (citing Simmons, 390 U.S. at 384). See also Bryant v. Commonwealth, 10 Va. App. 421, 427, 393 S.E.2d 216, 220 (1990) ("[w]here the admission of identification evidence does not give rise to a very

substantial likelihood of irreparable misidentification, the evidence is admissible and the weight to be attributed to it is for the jury to decide").

Having concluded the out-of-court identifications were sufficiently reliable under the factors set forth in Biggers so that no substantial likelihood of misidentification existed, no basis exists for excluding the in-court identifications made at trial. See Blevins, 40 Va. App. at 426, 579 S.E.2d at 665 (holding that "[b]ecause the admission of the pre-trial identifications was not error, no basis exists for excluding the in-court identifications"). See also Hodges v. Commonwealth, 45 Va. App. 735, 777, 613 S.E.2d 834, 854 (concluding that because out-of-court identifications were reliable, they could not have irreparably tainted the witnesses' subsequent in-court identifications), rev'd on other grounds, 272 Va. 418, 634 S.E.2d 680 (2006).

Accordingly, we conclude the trial court did not err in admitting the in-court identifications. We therefore affirm appellant's convictions.

Affirmed.

Benton, J., dissenting.

No one saw the person who shot Fredric Mark Jablin. At trial, the prosecutor conceded the police investigators used a suggestive identification procedure when they showed a single photograph of Piper Ann Rountree to seven people who became material witnesses at Rountree's murder trial. The essence of the Commonwealth's prosecution was the testimony of these seven witnesses detailing the activities of the person they identified from a photograph. Unlike the majority opinion, I would hold the trial judge erred in ruling the identifications resulting from the suggestive procedure were nonetheless so reliable that no substantial likelihood of misidentification existed and in ruling the in-court identifications were independent of the out-of-court identifications.

The Supreme Court long ago discussed the dangers of misidentification arising from improper display of photographs.

> It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.

Simmons v. United States, 390 U.S. 377, 383-84 (1968) (footnotes omitted). Thus, we have held that "significant problems are inherent in the use of a single-photograph identification procedure

. . . [because] 'a single photograph display is one of the most suggestive methods of identification and is always to be viewed with suspicion.'" Wise v. Commonwealth, 6 Va. App. 178, 184, 367 S.E.2d 197, 200 (1988) (quoting Hudson v. Blackburn, 601 F.2d 785, 788 (5th Cir. 1979)). Indeed, we have deemed the use of this type of single photograph display to potential witnesses to be "unduly suggestive." Id. "Preparation of a photographic spread containing pictures of different people is a minor burden for an investigator when measured against the potential prejudice to the accused." United States v. Workman, 470 F.2d 151, 153 (4th Cir. 1972).

> The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. Mr. Justice Frankfurter once said: "What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent — not due to the brutalities of ancient criminal procedure." The Case of Sacco and Vanzetti 30 (1927). A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. A commentator has observed that "[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor — perhaps it is responsible for more such errors than all other factors combined." Wall, Eye-Witness Identification in Criminal Cases 26. Suggestion can be created intentionally or unintentionally in many subtle ways. And the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest.

United States v. Wade, 388 U.S. 218, 228-29 (1967) (footnotes omitted).

In view of the investigators' use of this unduly suggestive method of presenting the potential witnesses a single photograph for identification, "the central question [becomes] whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Neil v. Biggers, 409 U.S. 188, 199 (1972). The

identification is reliable only if there is no substantial likelihood of misidentification. Simmons, 390 U.S. at 384. "[R]eliability is the linchpin in determining the admissibility of identification testimony." Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

The Supreme Court has identified the following factors to be considered in evaluating the reliability of the identification:

> the opportunity of the witness to view the [person] at the time of the [event], the witness' degree of attention, the accuracy of the witness' prior description of the [person], the level of certainty demonstrated by the witness at the confrontation, and the length of time between the [event] and the confrontation.

Biggers, 409 U.S. at 199-200. Consideration of these factors indicates the out-of-court identifications of several of the witnesses were not reliable.

The investigators showed Kathy Molley a single photograph of Rountree five days after Molley had ten to fifteen minutes contact with a woman to whom she sold an airplane ticket at a busy airport. Molley said the fact that the woman had a firearm in her luggage was not unusual at the big city airport in Texas and did not draw her attention to the woman. Molley testified she recalled the woman's name when the investigators questioned her, and she gave the investigator a description of the woman. Although the Commonwealth contends Molley had the opportunity to view the woman and was attentive to her, Molley's prior description of the woman's hair length and golden blond color, which she said was "real hair" and not a wig, did not match Rountree's hair length or color. Indeed, when Molley was in the presence of Rountree at the suppression hearing, Molley scanned the courtroom and did not "see the person that [she] saw" in the airport. Molley's inability to identify Rountree at the suppression hearing following her identification of Rountree's photograph during the suggestive procedure weighs heavily against any indicia of Molley's attentiveness or certainty about the encounter she had with a woman at the airport. This evidence establishes that Molley's out-of-court identification of Rountree was

- 20 -

inaccurate and based on a lack of attention. Her identification was shown to be unreliable and presented a substantial likelihood of misidentification.

Significantly, Molley described a very different woman than the woman described by the security screener who assisted her at the airport. Allan Benestante, who was with the woman in the presence of Molley five days before the police investigator questioned him, described the woman as being 5' 9" in height and having hair that was "dark in color" or "[d]ark brownish, black almost." This description contrasts with Molley's description of a woman five feet, one or two inches with "golden blond" hair. When the investigator showed Benestante the photograph of Rountree, Benestante said it appeared to be the woman he assisted and he quantified his belief as "65, about 60 percent." Significantly, Benestante said the hair color in the photograph was "blond," a color different from that of the woman he saw in the airport.

Benestante's ability to make a reliable identification also was compromised by the prejudicial effect of the single photo display. Additionally, the televised arrest of Rountree further solidified this image in his mind. See Hull v. State, 581 So. 2d 1202, 1207 (Ala. 1990) (finding witness' view of defendant's televised arrest "in very close proximity to a highly suggestive photographic line-up . . . may well have compounded the blatant suggestiveness of the photographic line-up"). Benestante's low level of certainty at the time of viewing the photograph reflected his lack of attention to the woman, one of the many airline passengers he encountered on a daily basis.

The great disparity between the descriptions given by Molley and Benestante, who both saw the woman at the same time at the airport, illustrates the unreliability of their out-of-court identifications. While they had an equal opportunity to view the woman they assisted, they had no particular reason to give more than passing attention to her among the thousands of airline passengers in the terminal. The discrepancies in their descriptions, each of which contains

- 21 -

erroneous facts, support the conclusion that neither witness paid a significant degree of attention to the woman they assisted. Furthermore, only Benestante specifically identified portions of the woman's facial features when questioned by the investigators, and he only did so after viewing the photograph. Even so, he quantified his level of certainty at only 60 to 65%. This evidence establishes a substantial likelihood that the unduly suggestive single photograph caused the witnesses to misidentify Rountree as the person they assisted.[7]

Boyd Adams testified the investigators showed him a single photograph and he learned during his discussions with them that the woman in the photograph had committed a homicide. He testified he identified the photograph as depicting a woman who used "her sister's I.D." to gain admittance to the firing range. At the suppression hearing, Adams testified he first saw the photograph on November 9th and was "ninety-five percent" certain it was the woman at the firing range. When he saw the photograph again on December 4th, he was "almost a hundred percent" certain of the identification. However, Adams estimated the woman's height to be five feet ten inches or five feet nine inches, which was not established to be Rountree's stature. See Dispensa v. Lynaugh, 847 F.2d 211, 221 (5th Cir. 1988); Loserth v. State, 985 S.W.2d 536, 546 (Tex. Ct. App. 1998) (holding the lack of accuracy of a witness' prior description the most significant of the Biggers factors).

---

[7] When reviewing the trial judge's determination of the admissibility of an out-of-court identification, these discrepancies should not be taken lightly or dismissed as a "weight of the evidence" issue to be determined by the jury. Cf. Satcher v. Commonwealth, 244 Va. 220, 249, 421 S.E.2d 821, 838-39 (1992) (holding that in an in-court identification of the defendant by a victim, "the differences between her description and [defendant's] actual appearance went to the weight, not the admissibility, of her identification evidence"). At the suppression hearing, it is the judge, not a jury, who must consider the accuracy of a witness' description to determine whether the identification itself is reliable and thereby admissible. Thus, where a witness' testimony establishes an inaccurate description, a lack of attentiveness, and an uncertainty, the judge must weigh these matters against "the corrupting effect of the suggestive identification itself" in determining admissibility. Manson, 432 U.S. at 114.

Significantly, Adams's professed levels of certainty and attention were refuted by the investigator, who testified Adams did not identify the photograph when the investigators first went to the firing range fourteen days after the woman had been there.

> When I spoke to Mr. Adams the first time, it was the 9th of November. It would have been the day after . . . Ms. Rountree was arrested. We went to the gun range. That was the first time we had ever been there. At that time, it was my first encounter with Mr. Adams. Um, it was not as memorable to me because while we showed the picture to him and several other people, I did not take anything away from that encounter that led me to believe that he was somebody that could help us out in this case one way or the other to eliminate or to include her or somebody.

> \* \* \* \* \* \* \*

> Um, I did not hear anything from Boyd Adams at that time, myself, that indicated that he had seen, heard anything relevant to this case at that encounter.

On the second occasion, almost a month later, when the investigator again showed Adams the same photograph of Rountree, Adams identified it as depicting the woman who had been shooting at the firing range.

Thus, although Adams testified at the suppression hearing that Rountree was the person at the gun range, Adams failed to indicate on the investigator's first visit that he recognized the person depicted in the photograph. When the investigator returned a month later and again showed Adams the same photograph, Adams expressed a high degree of certainty that the photograph represented the person he observed at the firing range. At that time, Adams knew the woman was suspected of homicide, but by then he had been influenced by the earlier viewing of the single photograph. His "inability to identify [Rountree] when first presented with [her] photograph is . . . critical." Curtis v. Commonwealth, 11 Va. App. 28, 31-32, 396 S.E.2d 386, 388 (1990). When he saw the photograph on the second occasion, he had had no additional contact with the woman. He had, however, seen the same single photograph a month earlier.

- 23 -

This evidence established Adams's identification had its genesis in the suggestion created by first viewing of the same photograph and was unreliable.

Tina Landrum described a woman who entered her store in Williamsburg an hour or more after the homicide. The woman, described as "5' 6", 5' 7," maybe 125 to 135 in weight," was in the store for five to seven minutes. Her hair was "dirty blond/brown color." Two days after the homicide, police officers showed Landrum a photograph of Rountree and asked if she had seen the person before. Landrum said "she was in here a few days ago" and said she was "99 percent" certain. Her level of certainty, degree of attention, and accuracy of description were revealed to be minimal, however, when she was unable to identify Rountree at the suppression hearing as the person she saw in her store.

Raymond Seward testified at the suppression hearing that "a medium-sized, Caucasian woman . . . age-wise . . . fortyish" with blond hair returned a vehicle to his rental company in Norfolk. When the police investigators showed him a single photograph of Rountree five days after that event, he identified it as the woman who returned the vehicle. He told the investigators the photograph did not resemble the driver's license photograph in his records for the person who rented the vehicle, but he said he was "a hundred percent" certain the woman in the photograph was the woman who returned the vehicle. Yet, at the suppression hearing, he was unable to identify Rountree as that woman.

Thus, Seward's testimony established that the corrupting effects of the suggestive identification outweighed any suggestion that he made his identification because he was attentive to the person he assisted at the rental office. The unreliability of his out-of-court identification was patently revealed when he was unable to identify Rountree at the suppression hearing as the person who returned the rental vehicle.

Insofar as the accused's conviction may rest on a courtroom
identification in fact the fruit of a suspect pretrial identification

- 24 -

which the accused is helpless to subject to effective scrutiny at trial, the accused is deprived of that right of cross-examination which is an essential safeguard to his right to confront the witnesses against him. And even though cross-examination is a precious safeguard to a fair trial, it cannot be viewed as an absolute assurance of accuracy and reliability. Thus in the present context, where so many variables and pitfalls exist, the first line of defense must be the prevention of unfairness and the lessening of the hazards of eyewitness identification [in the pre-trial process] itself. The trial which might determine the accused's fate may well not be that in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the witness the sole jury, and the accused unprotected against the overreaching, intentional or unintentional, and with little or no effective appeal from the judgment there rendered by the witness — "that's the man."

Wade, 388 U.S. at 235-36 (citation omitted).

I would hold that the out-of-court identifications by these witnesses based upon the suggestive showing of a single photograph of Rountree were so unreliable that a substantial likelihood of misidentification existed. Furthermore, when an out-of-court identification procedure produces an unreliable result, an in-court identification that is not independent of the suggestive pre-trial identification procedures is inadmissible. Wise, 6 Va. App. at 186, 367 S.E.2d at 202. Thus, I would also hold the Commonwealth has not demonstrated by clear and convincing evidence that the in-court identifications were independent of these unreliable out-of-court identifications. See Wade, 388 U.S. at 240 and n.31.

Several of the witnesses clearly demonstrated the origins of their in-court identifications at trial had their genesis in the suggestive procedure. For example, Molley was specifically instructed to look around the courtroom during the suppression hearing to see if she could identify the woman she assisted in the airport. Molley did not "see the person that [she] saw" at the airport. At trial, however, Molley was again shown the same single photograph and then immediately asked her level of certainty when she was first shown the photograph. Molley responded she was "positive" at that initial viewing that the person depicted in the photograph

- 25 -

was the person to whom she sold the ticket. When asked to identify that person in the courtroom during the trial, Molley again referenced the photograph, looked around the courtroom, and could only say "That lady [Rountree] right there looks familiar."

Molley's inability to identify Rountree at the suppression hearing and at trial, except by reference to the photograph, establishes that Molley's in-court identification was based on the improper pre-trial suggestive display of the single photograph. See State v. Jones, 658 So. 2d 307, 312 (La. 1995) (finding witness' view of a single photograph as the last step in a suggestive identification procedure resulted in an unreliable identification that thereby tainted the in-court identification); State v. Nicoletti, 471 A.2d 613, 616 (R.I. 1984) (holding that a witness' viewing of photographs under suggestive conditions twice before trial makes the establishment of an independent basis virtually impossible).

Similar to Molley, Landrum's level of certainty was demonstrated to be less than she professed. When asked to look around the courtroom at the suppression hearing to indicate "whether or not [she saw] anybody here that may be the same person," she testified she did not see the person whom she had seen in the store. At trial, she testified only that Rountree's "face is familiar." Seeing the woman briefly in the store, Landrum did not establish an opportunity to view the woman with any degree of attention. The evidence failed to establish that Landrum's trial identification, which followed Landrum's failure to identify Rountree at the suppression hearing, was independent of the undue suggestiveness of the single photograph display.

Likewise Seward's identification at trial did not have an origin independent of the suggestive out-of-court identification. Although Seward indicated to the investigators the photograph was of the woman who returned the car to his rental office, he was unable to identify Rountree at the suppression hearing as that person. At trial, however, Seward testified Rountree was the person who returned the car. He acknowledged her hair was the same length and same

color at trial as it was when he failed to identify her at the suppression hearing. His testimony provided no basis to indicate he had a degree of attention at the encounter that outweighed the undue suggestiveness of the single photograph displayed to him by the police investigators.

These witnesses had only brief encounters with the woman in question, and they viewed the single photograph presented by police not hours but days after the encounter. These witnesses had substantial difficulties regarding either the prior description (size, hair color, and/or height), or the level of certainty (or uncertainty), or the in-court identification at the suppression hearing. The inaccurate prior descriptions cannot be explained on the theory that the woman they saw might have been wearing a wig. In the photograph the witnesses viewed of Rountree, she was not wearing a wig. Despite testifying the woman in the photograph was Rountree, they could not identify her at the suppression hearing, but gained certainty at trial. Nothing in the record indicates that the initial identifications were made in circumstances allowing care and reflection. Each witness was approached by a police officer who identified himself as a crime investigator and, after discussing the woman he was investigating, asked if the witness recognized the woman in the photograph as the woman with whom the witness had one previous contact.

Although Adams and Benestante identified Rountree at the suppression hearing and at trial, their testimony should have been suppressed and not allowed to be considered by the jury. The determination that their circumstances were merely matters of credibility for the jury, and not suppression by the judge, placed Rountree at a significant disadvantage. As the Supreme Court observed in Wade, "even though cross-examination is a precious safeguard to a fair trial, it cannot be viewed as an absolute assurance of accuracy and reliability." 388 U.S. at 235.

Adams testified contrary to the investigator who interviewed him. The investigator's description of Adams's initial failure to identify the photograph as a person he had seen at the

firing range is a significant factor in discounting Adams's trial identification. Only when shown the same solo photograph a second time did he express recognition. Adams's recognition only upon viewing the same single photograph a second time is evidence that his opportunity to view the woman and his degree of attention to her at the firing range were not significant factors in his later in-court identification. His identification was not independent of the suggestion implanted in his memory by the display of the same single photograph on the two occasions and his knowledge that the police were conducting a homicide investigation. See Wise, 6 Va. App. at 186, 367 S.E.2d at 202 (holding a showing that pre-trial identification was unreliable taints the in-court identification so as to preclude any basis for holding that the witness' identification had an "origin independent of the inadmissible out-of-court identification"). The evidence failed to establish Adams's identification testimony was not the product of the unduly suggestive pre-trial display of the same photograph twice to Adams.

Although Benestante testified at the suppression hearing that the woman's hair was "[d]ark brownish, black almost," at trial he contradicted that testimony and testified the woman he observed had "darkish-blond, very blond" hair. He also testified he saw Rountree being arrested on television and recognized her as the woman he observed at the airport. Benestante's testimony and in-court identification conformed to the photograph he saw and contradicted the description he earlier gave of a woman with hair that was "black almost."

The importance of scrutinizing these discrepancies in the course of determining admissibility cannot be overstated. As the Supreme Court noted in Wade, "there is a serious difficulty in depicting what transpires at . . . identification confrontations"; therefore, "the defense can seldom reconstruct the manner and mode of [pre-trial] identification for judge or jury at trial." 388 U.S. at 230. As the Court further reasoned, "[i]nsofar as the accused's conviction may rest on a courtroom identification in fact the fruit of a suspect pretrial

identification which the accused is helpless to subject to effective scrutiny at trial, the accused is deprived of that right of cross-examination which is an essential safeguard to his right to confront the witnesses against him." Id. at 235. Here, the "first line of defense," which the Wade Court identified as "the prevention of unfairness and the lessening of the hazards of eyewitness identification," id., was breached by the use of an unduly suggestive procedure. To dismiss the gravity of this breach without consideration of its impact on the reliability of the witnesses' testimony only serves to further compound the prejudice created by the initial suggestive procedure.

For these reasons, I would hold that nothing in the record separates the in-court identifications from the unreliable out-of-court identifications. There is simply no basis to conclude that the in-court identifications were "independent" of the out-of-court identifications. See id.; Workman, 470 F.2d at 153. Because the in-court identifications of these witnesses were not shown to originate independently of the unduly suggestive display of the single photograph and the resulting unreliable out-of-court identifications, I would hold that the trial judge erred in permitting the jury to consider their testimony at trial. As we observed in Wise, "[j]uries perceive strength in numbers where eyewitness identifications are presented." 6 Va. App. at 187, 367 S.E.2d at 202. The judge should have suppressed the identifications.